## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICIA THIEFFRY, Derivatively and on Behalf of SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, KAREN L. ROSENBERGER, RONALD W. HOVSEPIAN, and JOHN FREDERICK, <br><br> Defendants, <br><br> and <br><br> SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Patricia Theiffry ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Stephen G. Waldis, William J. Cadogan, Thomas J. Hopkins, James M. McCormick, Donnie M. Moore, Karen L. Rosenberger, Ronald W. Hovsepian, and John Frederick (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Synchronoss, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act").  As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Synchronoss, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Synchronoss' directors and officers.

2.      Synchronoss purportedly provides mobile solutions for Service Providers and Enterprise through scalable software solutions and platforms. The Company claims it simplifies the creation and management of customer and employee experiences associated with identity, cloud, messaging, applied analytics, and secure mobility.

3.      On November 7, 2016, the Company announced that, in an effort to enhance shareholder value, it was evaluating strategic alternatives for its activation business, which provides activation services for mobile operators.

4.      On December 6, 2016, the Company announced that it was divesting 70% of its carrier activation business to Sequential Technology International, LLC ("Sequential") for $146 million and acquiring Intralinks Holdings, Inc. ("Intralinks") for $821 million in equity value.

5.     On February 24, 2017, the Southern Investigative Reporting Foundation ("SIRF"), published a report accusing Synchronoss of concealing key aspects of the Intralinks and Sequential deals from investors and noting that Sequential was actually Omniglobe USA ("Omniglobe"), a business process outsourcer that has extensive ties to the Company and its senior executives.  In fact, Omniglobe is 50% owned by "friends and family of Synchronoss."

6.     On February 27, 2017, Synchronoss filed a Form 10-K with the SEC that revealed that a $9.2 million licensing agreement was entered into between the Company and Sequential for the use of Synchronoss' Analytics software, with the $9.2 million amount being recorded as revenue and conveniently allowing the Company to meet its revenue and earnings targets.

7.     After making this disclosure, the Company's stock price fell $1.80 per share, or 5.9%, to close at $28.69 per share on February 27, 2017.

8.     On April 27, 2017, the Company issued a press release announcing management changes.  The Company disclosed that its Chief Executive Officer, Defendant Ronald W. Hovsepian ("Hovsepian"), would be leaving the Company "to pursue other interests." According to the press release, Defendant John Frederick ("Frederick"), the Company's Chief Financial Officer, would also be leaving "to pursue other interests." Additionally, the Company admitted that it "expect[ed] total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance. Operating margins are expected to be 8% to 10%, which are less than previously announced guidance."  Defendant Stephen G. Waldis ("Waldis"), who would take over again as Chief Executive Officer, further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."

9.      After making this disclosure, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017, on unusually heavy trading volume.

10.      On May 12, 2017, the Company filed with the SEC a notification of its inability to file with the SEC its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.

11.      On May 15, 2017, the Company issued a press release stating that the Company needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because, *inter alia*, Defendant Waldis and newly appointed CFO Lawrence Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, which they did, and that its independent auditor subsequently advised that additional reviews by Defendant Waldis and Mr. Irving were needed, which the Company is in the process of completing.

12.      The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

13.      On May 22, 2017, the Company issued a press release that stated that on May 16, 2017, it received notice from the Listing Qualifications Department of the NASDAQ.  The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017…."

14.      Due to this yet additional bad news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

- 4 -

15.     On June 13, 2017, the Company filed a Form 8-K with the SEC announcing that the Company's previously filed financial statements for the fiscal years ended December 31, 2016 and 2015 and the quarterly periods within those years would need to be restated and could no longer be relied upon.

16.     On this news, the Company's stock price fell further to close at $11.26 per share on June 14, 2017.

17.     From October 28, 2015 through April 27, 2017 (the "Relevant Period"), the Company began issuing press releases and filing quarterly reports on Form 10-Q and an annual report on Form 10-K containing materially false and misleading statements that artificially inflated the Company's stock price.  These statements were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud

computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company failed to maintain internal controls; and (12) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

18.     Furthermore, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while the vast majority of them engaged in lucrative insider sales, netting proceeds of over $9.4 million.   337,009 shares of the Company's common stock were repurchased during May 2016 and June 2016 for over $11.4 million.  As the Company stock was actually only worth $12.82 per share, the Company overpaid about $21 per share, overpaying over $7 million in total.  The Company has failed to timely file a Form 10-Qs for the quarter ended March 31, 2017 and June 30, 2017, and, therefore, has failed to disclose any repurchases of the Company's common stock during the 2017 fiscal year.

19.     The Individual Defendants breached their fiduciary duties by permitting, facilitating, and causing the Company to make false and misleading statements and/or omissions of material fact, by permitting, facilitating, and causing the Company to fail to correct these false and misleading statements and/or omissions of material fact, and by causing Synchronoss to make the repurchases of Company stock at artificially inflated prices while six of the Individual Defendants engaged in lucrative insider sales of Company stock.

20.     The Individual Defendants further breached their fiduciary duties by failing to maintain internal controls, leading to the Company's forthcoming restatements of its financial statements.

21.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its current and former CEOs and its two former CFOs to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Fraud Class Action"), the need to undertake internal investigations, losses due to the Company's overpayment of more than $7 million for the repurchases of its own stock and to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and of six of the Individual Defendants who received ill-gotten gains from insider sales netting proceeds of over $9.4 million, and will cost the Company going forward many millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current Directors, of the collective engagement in fraud and insider selling by six of them, including all of the Company's five directors, of the substantial likelihood of the Directors' liability in this derivative action and of certain of them in the related Securities Fraud Class Action, and of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of Synchronoss common stock. Plaintiff has continuously held Synchronoss common stock since prior to the beginning of the Relevant Period.

**Nominal Defendant Synchronoss**

29.     Nominal Defendant Synchronoss is a Delaware corporation with its principal executive offices at 200 Crossing Boulevard, 8th Floor, Bridgewater, New Jersey 08807.

30.     Synchronoss is registered to do business in New Jersey.  Synchronoss' New Jersey Business Entity ID Number, 0100909639, is listed on the website for the New Jersey Division of Revenue & Enterprise Services, and Synchronoss has an active State of New Jersey Business Registration Certificate Number, 1007036.

31.     Synchronoss stock trades on the NASDAQ under the ticker symbol "SNCR."

**Defendant Waldis**

32.     Waldis has been the Company's Executive Chairman since January 2017. He has been the Company's Chairman of the Board of Directors since 2001, throughout the entire Relevant Period, was Chief Executive Officer from 2000 until January 2017, and was renamed Chief Executive Officer of the Company in April 2017. According to the Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement"), on March 23, 2016, around a month from the start of the Relevant Period, Defendant Waldis beneficially owned over 935,000 shares of the Company's common stock, which was about 2% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Waldis owned about $28.3 million worth of Synchronoss stock.

33.     For the fiscal year ended December 31, 2016, Defendant Waldis received $5,707,946 in compensation from the Company.  This included almost $700,000 in cash and $1,261,248 worth of stock options.  Waldis's base salary for 2016 was $608,900.

34.     The Company's 2017 Proxy Statement stated the following about Defendant Waldis:

> Stephen G. Waldis has served as our Executive Chairman since January 2017, having service as Chairman of the Board of Directors since 2001[,] Chief Executive Officer from 2000 until January 2017 and as a director since founding Synchronoss in 2000. From 2000 until 2011, Mr. Waldis also served as President. From 1994 to 2000, Mr. Waldis served as Chief Operating Officer at Vertek Corporation, a privately held professional services company serving the telecommunications industry. From 1992 to 1994, Mr. Waldis served as Vice President of Sales and Marketing of Logical Design Solutions, a provider of telecom and interactive solutions. From 1989 to 1992, Mr. Waldis worked in various technical and product management roles at AT&T. Mr. Waldis received a Bachelor of Arts degree in corporate communications from Seton Hall University. Our Board believes Mr. Waldis' qualifications to sit on our Board include his extensive experience in the software and services industry, and serving as our Chief Executive Officer and one of our founders.

35.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant Waldis made the following sales of Company stock (and made no purchases of Company stock). On May 18, 2016, Defendant Waldis sold 13,000 shares of Company stock for $34.83 per share. On June 8, 2016, Defendant Waldis sold 13,000 shares of Company stock for $36.12 per share. On July 6, 2016, Defendant Waldis sold 13,000 shares of Company stock for $32.32 per share. On August 24, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.61 per share.  On September 14, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.43 per share.  On October 5, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.85 per share.  On February 3, 2017, Defendant Waldis sold 8,265 shares of Company stock for $39.00 per share.  On February 14, 2017, Defendant Waldis sold 13,853 shares of Company stock for $33.71 per share.  On February 21, 2017, Defendant Waldis sold 11,852 shares of Company stock for $32.66 per share.  Thus, in total, before the fraud was exposed, he

sold 130,480 Company shares on inside information, for which he received $4.1 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Cadogan**

36.     William J. Cadogan has been on the Company's Board of Directors since 2005, throughout the entire Relevant Period.  According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Cadogan beneficially owned about 344,852 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Cadogan owned over $10.4 million worth of Synchronoss stock.

37.     For the fiscal year ended December 31, 2016, Defendant Cadogan received $283,194 in compensation from the Company.  This included $85,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

38.     The Company's 2017 Proxy Statement stated the following about Defendant Cadogan:

> William J. Cadogan served as a Senior Managing Director with Vesbridge Partners, LLC, formerly St. Paul Venture Capital, a venture capital firm from 2001 until 2006. Mr. Cadogan served as Chief Executive Officer and Chairman of the board of directors of Mahi Networks, Inc., a leading supplier of multi-service optical transport and switching solutions, from November 2004 until its merger with Meriton Networks in October 2005. Prior to joining St. Paul Venture Capital in 2001, Mr. Cadogan was Chairman and Chief Executive Officer of ADC, Inc., a leading global supplier of telecommunications infrastructure products and services. Mr. Cadogan received a Bachelor of Arts degree in electrical engineering from Northeastern University and a master in business administration degree from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Cadogan's qualifications to sit on our Board include his experience as

a CEO leading complex global organizations, combined with his operational and corporate governance expertise.

39.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant Cadogan made the following sales of Company stock (and made no purchases of Company stock).  On December 30, 2016, Defendant Cadogan sold 20,000 shares of Company stock for $38.56 per share.  On January 4, 2017, Defendant Cadogan sold 7,500 shares of Company stock for $39.39 per share.  Thus, in total, before the fraud was exposed, he sold 27,500 Company shares on inside information, for which he received over $1.06 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Hopkins**

40.     Thomas J. Hopkins ("Hopkins") has been on the Company's Board of Directors since 2004 and during the entire Relevant Period.  According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Hopkins beneficially owned about 84,678 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Hopkins owned over $2.5 million worth of Synchronoss stock.

41.     For the fiscal year ended December 31, 2016, Defendant Hopkins received $275,694 in compensation from the Company.  This included $77,500 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

42.     The Company's 2017 Proxy Statement stated the following about Defendant Hopkins:

Thomas J. Hopkins is a Managing Director of Colchester Capital, LLC, an investment firm. Prior to Colchester Capital, Mr. Hopkins was involved in investment banking, principally at Deutsche Bank (and its predecessor Alex, Brown & Sons), Goldman, Sachs & Co. and Bear Stearns. He began his investment banking career at Drexel Burnham Lambert. Prior to investment banking, Mr. Hopkins was a lawyer for several years. Mr. Hopkins received a Bachelor of Arts degree from Dartmouth College, a juris doctorate from Villanova University School of Law and a master in business administration degree from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Hopkins' qualifications to sit on our Board include his extensive financial expertise and his years of experience providing strategic advisory services to complex organizations.

43.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant Hopkins made the following sale of Company stock (and made no purchases of Company stock). On December 15, 2016, Defendant Hopkins sold 27,500 shares of Company stock for $41.65 per share. Thus, in total, before the fraud was exposed, he sold 27,500 Company shares on inside information, for which he received over $1 million.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**Defendant McCormick**

44.     James M. McCormick ("McCormick") is one of Synchronoss' founders and has been on the Company's Board of Directors since the Company was founded in 2000 and during the entire Relevant Period.  According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant McCormick beneficially owned over 3.1 million shares of the Company's common stock, which was almost 7% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common

- 13 -

stock at the close of trading on March 23, 2016 was $30.30, McCormick owned over $94.7 million worth of Synchronoss stock.

45.     For the fiscal year ended December 31, 2016, Defendant McCormick received $248,194 in compensation from the Company.  This included $50,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

46.     The Company's 2017 Proxy Statement stated the following about Defendant McCormick:

> James M. McCormick is a founder of Synchronoss, has been a member of our Board since our inception in 2000 and served as our Treasurer from September 2000 until December 2001. Mr. McCormick is founder and Chief Executive Officer of Vertek Corporation. Prior to founding Vertek in 1988, Mr. McCormick was a member of the Technical Staff at AT&T Bell Laboratories. Mr. McCormick received a Bachelor of Science degree in computer science from the University of Vermont and a master of science degree in computer science from the University of California — Berkeley. Our Board believes Mr. McCormick's qualifications to sit on our Board include his over 25 years in the consulting, telecommunications and services business, as well as being one of our founders.

47.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant McCormick made the following sale of Company stock (and made no purchases of Company stock).  On August 4, 2016, Defendant McCormick sold 27,500 shares of Company stock for $40.00 per share.  Thus, in total, before the fraud was exposed, he sold 27,500 Company shares on inside information, for which he received over $1 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Moore**

48.     Donnie M. Moore ("Moore") has been on the Company's Board of Directors since 2007 and during the entire Relevant Period.  According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Moore beneficially owned 96,092 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Moore owned over $2.9 million worth of Synchronoss stock.

49.     For the fiscal year ended December 31, 2016, Defendant Moore received $273,194 in compensation from the Company.  This included $75,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

50.     The Company's 2017 Proxy Statement stated the following about Defendant Moore:

> Donnie M. Moore was Senior Vice President, Finance and Administration and Chief Financial Officer for Cognos Incorporated, a publicly-held company providing business intelligence and performance management solutions, from 1989 until his retirement in 2001. From 1986 to 1989, Mr. Moore was Vice President, Finance and Chief Financial Officer of Cognos. Before joining Cognos, Mr. Moore held various positions at the Burroughs Corporation from 1973 to 1986, including Corporate Director, Plans and Analysis. Mr. Moore holds a Bachelor of Science degree in engineering from the University of Oklahoma and a master in business administration degree from the University of Houston. Our Board believes Mr. Moore's qualifications to sit on our Board include his extensive experience in the software industry and his financial expertise.

51.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant Moore made the following sales of Company stock (and made no purchases of Company stock). On September 12, 2016, Defendant Moore sold 5,500 shares of Company stock for $40.63 per

share.  On October 12, 2016, Defendant Moore sold 5,500 shares of Company stock for $39.38 per share.  On November 14, 2016, Defendant Moore sold 5,500 shares of Company stock for $47.93 per share.  On December 13, 2016, Defendant Moore sold 5,500 shares of Company stock for $41.15 per share.  On January 12, 2017, Defendant Moore sold 5,500 shares of Company stock for $38.19 per share.  Thus, in total, before the fraud was exposed, he sold 27,500 Company shares on inside information, for which he received over $1.14 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Rosenberger**

52.    Karen L. Rosenberger ("Rosenberger") was the Company's Executive Vice President and Chief Financial Officer during the Relevant Period until resigning on February 27, 2017; her employment was terminated on April 1, 2017.   According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Rosenberger beneficially owned over 45 thousand shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Rosenberger owned over $1.37 million worth of Synchronoss stock.

53.    For the fiscal year ended December 31, 2016, Defendant Rosenberger received $1,720,909 in compensation from the Company.  This included almost $400,000 in cash and $307,617 worth of stock options.  Rosenberger's base salary for 2016 was $360,000.

54. The Company's annual report for the year ended December 31, 2015 on Form 10-K that was filed with the SEC on February 26, 2016 stated the following about Defendant Rosenberger:

> *Karen L. Rosenberger* has served as Chief Financial Officer and Treasurer since April 2014. Prior to that position, Ms. Rosenberger served in various positions at Synchronoss since joining Synchronoss in 2000, most recently as Senior Vice President, Controller and Chief Accounting Officer. Before joining Synchronoss, Ms. Rosenberger held various management positions with Medical Broadcasting Company and CoreTech Consulting Group. Ms. Rosenberger received a degree in accounting from Cedar Crest College and a Master of Business Administration from Saint Joseph's University. Ms. Rosenberger is a certified public accountant and a member of the American Institute of Certified Public Accountants and the New Jersey Society of Certified Public Accountants.

55. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, Defendant Rosenberger made the following sales of Company stock (and made no purchases of Company stock). On May 24, 2016, Defendant Rosenberger sold 83 shares of Company stock for $35.30 per share. On July 6, 2016, Defendant Rosenberger sold 787 shares of Company stock for $31.45 per share. On August 22, 2016, Defendant Rosenberger sold 83 shares of Company stock for $40.77 per share. On October 3, 2016, Defendant Rosenberger sold 755 shares of Company stock for $40.86 per share. On November 21, 2016, Defendant Rosenberger sold 83 shares of Company stock for $48.92 per share. On December 27, 2016, Defendant Rosenberger sold 10,000 shares of Company stock for $39.51 per share. On December 28, 2016, Defendant Rosenberger sold 4,000 shares of Company stock for $39.63 per share. On January 4, 2017, Defendant Rosenberger sold 815 shares of Company stock for $38.84 per share. On January 11, 2017, Defendant Rosenberger sold 3,000 shares of Company stock for $38.07 per share. On January 23, 2017, Defendant Rosenberger sold 777 shares of Company stock for $39.08 per

share.  On February 3, 2017, Defendant Rosenberger sold 2,162 shares of Company stock for $39.00 per share.  On February 8, 2017, Defendant Rosenberger sold 2,000 shares of Company stock for $36.93 per share.  On February 14, 2017, Defendant Rosenberger sold 516 shares of Company stock for $33.73 per share.  On February 21, 2017, Defendant Rosenberger sold 3,183 shares of Company stock for $32.64 per share.  Thus, in total, before the fraud was exposed, she sold 28,244 Company shares on inside information, for which she received approximately $1.1 million.  Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

**Defendant Hovsepian**

56.     Hovsepian was the Company's Chief Executive Officer and a member of the Board from January 19, 2017, and principal executive officer from March 1, 2017, until his resignation on April 27, 2017. Previously, from December 2011 until its sale to Synchronoss in January 2017, Defendant Hovsepian was President, Chief Executive Officer and Director of Intralinks.  According to the 2017 Proxy Statement, as of March 27, 2017, Defendant Hovsepian beneficially owned about 54,780 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 27, 2017 was $24.59, Hovsepian owned over $1.3 million worth of Synchronoss stock.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Hovsepian:

> *Ronald W. Hovsepian* has served as our Chief Executive Officer and a member of the Board since January 2017. Previously, from December 2011 until its sale to Synchronoss in January 2017, Mr. Hovsepian served as President, Chief Executive Officer and Director of Intralinks. Prior to his role at Intralinks, Mr. Hovsepian served as President

and Chief Executive Officer of Novell, Inc. from 2006 until Novell's acquisition by the Attachmate Group in April 2011. He joined Novell in 2003 as President, North America, and next served as Executive Vice President and President, worldwide field operations, and as President and Chief Operating Officer from 2005 until his appointment as Chief Executive Officer in 2006. Prior to his time at Novell, Mr. Hovsepian held a series of management and executive positions at IBM Corporation over an approximately 17-year period, including worldwide general manager of IBM's distribution industries, manager of global hardware and software development, sales, marketing and services. Mr. Hovsepian currently serves as a member of the board of directors of ANSYS, Inc., an engineering simulation software publicly-held company, a role he has held since 2012, and, from November 2014 to December 2016, he also held the position of non-executive chairman. From 1998 to 2015, Mr. Hovsepian served as a member of the board of directors of ANN Inc., a women's fashion retailer. He also held the position of non-executive chairman of ANN's board of directors from 2005 to 2015. Mr. Hovsepian received a Bachelor of Science degree from the Carroll School of Management at Boston College. Our Board believes Mr. Hovsepian's qualifications to sit on our Board include his extensive experience in the software and services industry, as well as his position as our Chief Executive Officer.

### Defendant Frederick

58.     Frederick was the Company's Chief Financial Officer from February 27, 2017 until he resigned on April 27, 2017 "to pursue other interests."  According to the 2017 Proxy Statement, as of March 27, 2017, Defendant Frederick beneficially owned about 53,971 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 27, 2017 was $24.59, Frederick owned over $1.3 million worth of Synchronoss stock.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Frederick:

*John W. Frederick* has served as our Chief Financial Officer since February 2017. Prior to joining our Company, he served as Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Avid Technologies, Inc. from April 2013 through May 2016 and, prior to that, he served as Chief of Staff of Avid from February 2013 to April 2013. From November 2009 until joining Avid, Mr. Frederick was Executive Vice President and Chief Financial Officer of Open Solutions, Inc., a technology provider to financial institutions worldwide, which was acquired in January 2013 by Fiserv, Inc.

From October 2006 to October 2007, Mr. Frederick served first as interim Chief Financial Officer and then as Chief Financial Officer of SafeNet, Inc., a global encryption security company. After a brief transition in connection with the acquisition of SafeNet, he rejoined SafeNet as Chief Financial Officer in November 2007 and served in that role until August 2009. Additionally, Mr. Frederick has held a variety of senior financial, business planning, and analysis roles at organizations including AlliedSignal (now part of Honeywell), Time Warner and Sunbeam Corporation. Early in his career, he also served in the audit practice of Coopers & Lybrand, now part of PricewaterhouseCoopers LLP. Mr. Frederick received a degree in economics from the University of Maryland and is a certified public accountant in the state of Maryland (inactive).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.    By reason of their positions as officers, directors and/or fiduciaries of Synchronoss and because of their ability to control the business and corporate affairs of Synchronoss, the Individual Defendants owed Synchronoss and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Synchronoss in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Synchronoss and its shareholders so as to benefit all shareholders equally.

61.    Each director and officer of the Company owes to Synchronoss and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Synchronoss, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Synchronoss' Board at all relevant times.

65.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Synchronoss' own internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Synchronoss conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Synchronoss and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Synchronoss' operations would comply with all laws and Synchronoss' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

- 22 -

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

67.      Each of the Individual Defendants further owed to Synchronoss and the shareholders the duty of loyalty requiring that each favor Synchronoss' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Synchronoss and were at all times acting within the course and scope of such agency.

69.      Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchronoss.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act ; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Synchronoss was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synchronoss, and was at all times acting within the course and scope of such agency.

### INDIVIDUAL DEFENDANTS' MISCONDUCT

### Materially False and Misleading Statements Issued During the Relevant Period

76.     On October 28, 2015, the Company issued a press release announcing its financial results for the quarter ended September 30, 2016, in which Defendant Waldis touted the financial prospects of the Company, stating that Synchronoss has "significantly expanded [its] addressable market with the launch of [its] enterprise business and the Synchronoss Secure Mobility Suite" and that the adoption of the Company's "cloud and activation platforms continues to grow globally."  Defendant Rosenberger also discussed the Company's purportedly strong financial position, noting that "strategic customer relationships, combined with our growth investments and expansion into new market opportunities, position us well to scale Synchronoss to the next level and generate greater shareholder value over time."

77.     On February 3, 2016, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2015, reporting $157.8 million in revenue

for the fourth quarter, which was a 21% increase year-over-year.  For the quarter, the press release additionally reported earnings per share at $0.61, a 16% increase year-over-year, and Cloud Services revenue at $90.9 million, a 43% increase year-over-year.  In the press release, Defendant Waldis touted the Company's Cloud Services business, stating that the "Cloud Services business continues to perform, well, driven by increasing subscriber adoption across our expanding customer base."  Defendant Rosenberger commented positively on the Company's prospects, stating that the Company's investments in the year 2015 position Synchronoss "to generate significant value for our shareholders."

78.     On February 4, 2016, the Company issued a press release announcing a $100 million share repurchase program, noting that "Synchronoss has a very strong market position and financial profile, in addition to a large and expanding addressable market opportunity."  In the press release, Defendant Waldis stated that, "[w]e expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow.  In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile."

79.     On April 7, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement").  The 2016 Proxy Statement touted the Company's "record financial results" in 2015 and the future prospects of the Company.  However, the 2016 Proxy Statement failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a

related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company failed to maintain internal controls; and (12) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

80.     On May 5, 2016, the Company issued a press release announcing "strong first quarter" results for the quarter ended March 31, 2016.  Specifically, the Company stated that "[c]loud services were robust this quarter, as increasing subscriber growth on our core customer base is laying the groundwork for incremental cloud opportunities both domestically and internationally over the next 12 to 18 months."

81.     On May 10, 2016, the Company filed with the SEC its quarterly report for the quarter ended March 31, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("1Q 2016 10-Q").  This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on May 5, 2016. Attached to the 1Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the

Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 1Q 2016 10-Q.

82.    On August 3, 2016, the Company issued a press release announcing "strong second quarter" results for the quarter ended June 30, 2016.  Specifically, the Company stated that "Cloud was strong this quarter, as solid subscriber growth in our core customer base is setting the stage for incremental cloud opportunities while investments in the enterprise initiatives are already generating significant customer activity in the field."

83.    On August 4, 2016, the Company filed with the SEC its quarterly report for the quarter ended June 30, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("2Q 2016 10-Q").  This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on August 3, 2016.  Attached to the 2Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2Q 2016 10-Q.

84.    On November 7, 2016, the Company issued a press release announcing "strong third quarter" results for the quarter ended September 30, 2016.  Specifically, the Company stated that "Cloud was very strong this quarter with both new and existing customers, as solid subscriber growth and expanded cloud initiatives in our core customer base set the stage for the next chapter of growth at Synchronoss."

85.    Also on November 7, 2016, the Company also held an earnings call discussing its financial results for the quarter ended September 30, 2016, in which the Company announced

that it would "evaluate strategic alternatives" for its activation business in an effort to enhance shareholder value. Defendant Waldis stated, in relevant part:

> So, we're obviously in the process of evaluating opportunities in the activation world. Clearly, there are good pockets of strength, certainly in analytics, certainly in some of the new emerging areas, Internet of Things. But there has been obviously areas or facets that have slowed down as you guys have seen in the market today. And so, when you look and compare that to both our cloud and enterprise business that have both high growth trajectories and margin profile significantly better than the activation business, we want to make sure that as we evaluate the process that we're doing everything we can to ensure we're making the investments in the high-growth, high margin businesses of the future. And that's something that will play out over the next quarter or so, and as we'd mentioned we'll certainly keep everybody up to speed.

86.    On November 8, 2016, the Company filed with the SEC its quarterly report for the quarter ended September 30, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("3Q 2016 10-Q"). This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on November 7, 2016. Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 3Q 2016 10-Q.

87.    On December 6, 2016, the Company issued a press release announcing its planned acquisition of Intralinks, stating that the Company had "entered into a definitive agreement for Synchronoss to acquire Intralinks for approximately $821 million in equity value." The press release provided inflated guidance for 2017 as follows: "With the impact from the Sequential Technology divestiture and assuming a late first quarter 2017 close on the Intralinks deal, Synchronoss is giving initial 2017 revenue guidance of between $810 million and $820 million with pro forma EPS of between $2.45 and $2.60 for the combined entity." The Company also announced that "[Defendant] Hovsepian, Chief Executive Officer of Intralinks, is expected to be

appointed Chief Executive Officer of Synchronoss and join the Synchronoss Board of Directors"

after the acquisition of Intralinks.   Moreover, the press release depicted Intralinks as a very

successful business entity, stating, in relevant part:

> In Intralinks' 20-year history, over 4.1 million business users across the world have used its secure, cloud-based platform, and it counts 99% of Fortune 1000 companies among its customers. To date, Intralinks has supported over $31 trillion in high-stakes transactions, making the company a leader in the enterprise content collaboration market.
>
> "Intralinks has established itself as a household name in the financial services world over the past 20 years, with a keen focus on growing its presence into the next generation secure content collaboration market over the coming years," said Stephen Waldis, Synchronoss' CEO. "This acquisition marks another major step in the transformation of Synchronoss to significantly expand the scale and scope of the company's enterprise initiatives and strong carrier relationships in attacking this multi-billion dollar market opportunity.  [ . . . ]."
>
> *  *  *
>
> "Our board of directors unanimously concluded that Synchronoss is the ideal strategic partner for Intralinks and also gives our employees and customers the opportunity to leverage Synchronoss' deep relationships across the carrier space, cloud expertise, and strong partnerships in the financial services vertical," said Ron Hovsepian, CEO of Intralinks. "Together with Synchronoss, we believe we can deploy enhanced enterprise and mobile solutions to our customers while opening up new enterprise distribution channels across the world."

88.     The Company's December 6, 2016 press release additionally stated that the

Company would divest 70% of its activation business to Sequential for a total purchase price of

$146 million, and that the 30% ownership interest in the activation business that was retained by

the Company could be reduced during 2017 as part of the transaction.   Considering the

divestiture and the acquisition of Intralinks, the press release provided "initial 2017 revenue

guidance of between $810 million and $820 million with pro forma EPS of between $2.45 and

$2.60 for the combined entity."   Moreover, the press release noted that the Company was

"targeting $40 million of combined synergies within the first year of closing the Intralinks deal."

89.     On January 5, 2017, the Company filed a Form 8-K/A with the SEC revealing several financial aspects of the Company's activation business divestiture to Sequential, including that it would initially net the Company only $17.3 million in cash and would include an $83 million note receivable.  The Form 8-K/A additionally provided financial statements depicting what the Company's financial position would be had the divestiture been completed, revealing that the Company will continue to bear costs associated with the activation business due to its remaining 30% ownership stake, such as corporate overhead, cost of services, and stock-based compensation.  In providing the impact the divestiture would have on the Company's financial statements, the Form 8-K/A revealed specific terms of the divestiture agreement, including, among other things, that: (1) the  $17.3 million payment "[r]epresents Synchronoss' cash distribution of approximately $17.3 million as part of the $100.3M consideration received in connection with the sale of 65.6%"; (2) Sequential contributed assets for the remaining 4.4% ownership; (3) "[a]pproximately $30 million has been set aside in escrow to cover certain conditions of the closing of the Sale . . . ."; (4) [i]n connection with the Sale, the billed receivables of the [activation business] were excluded from the transfer to [Sequential]; and (5) "Synchronoss received a Sellers Note of approximately $83.0 million as part of the proceeds in connection with the Sale, which can be reduced or paid back in full to Synchronoss during 2017."

90.     On January 5, 2017, the Company also filed a Form 8-K with the SEC with attached materials concerning its joint venture and three-year transition services agreement with Sequential.  The Form 8-K noted that the Company's transaction with Sequential was structured as a joint-venture, and that the Company would retain a 30% ownership stake and contribute

certain components of its carrier activation business, and that Sequential would own the remaining 70% of the joint venture and had agreed to finance "the purchase of these assets through cash, a new term loan, and a sellers note issued by Synchronoss."  It was noted that the Company entered into the transition services agreement with Sequential in order to support various indirect activities stemming from the joint venture.  Further, the Company would receive an annual payment of approximately $32 million pursuant to the terms of the agreement. Sequential announced on January 12, 2017 that the transaction had closed.

91.     On February 8, 2017, the Company issued a press release announcing financial results for the fiscal quarter and year ended December 31, 2016, including non-GAAP combined total revenue of $147.8 million and non-GAAP earnings per share of $0.24 for the quarter. Specifically, the Company stated that it "has been an exciting time at Synchronoss over the past few months as we view the acquisition of Intralinks to be a major step forward in our enterprise strategy with [Defendant Hovsepian] leading the team to successfully integrate both companies into a single portfolio."  Defendant Hovsepian added that the Company "has transformed its strategy with the Intralinks acquisition and divestiture of its traditional activation business as the company now looks to expand the scale and scope of its enterprise and cloud initiatives to drive the new SNCR 3.0 vision."

92.     On February 8, 2017, the Company held a conference call to discuss its financial results for the 2016 fiscal year.  During this call, Defendant Rosenberger stated that, with the Intralinks transaction closed, "2017 non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined Company. On a normalized basis when adjusting for divestitures and the Intralinks

acquisition, this would imply year-over-year growth of between 13% and 15%." Defendant Rosenberger also stated that, for the first quarter of the 2017 fiscal year, the Company "expect[s] total revenues of between $173 million and $178 million…[w]e currently expect non-GAAP gross margins of between 70% and 71% for the full year 2017." During the conference call, Defendant Rosenberer engaged in an exchange with an analyst concerning the payments the Company expected to receive from Sequential as part of the Company's divestiture of part of its activation business, which was as follows:

> [Tavis C. McCourt]
>
> Okay. And then, just some details on the Sequential sale. So, can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period and maybe the margins on those revenues and kind of the timing of when you would expect them to go away?
>
> [Defendant Rosenberger]
>
> Yeah. So, I can give you some information on that, Tavis. I think as we went through the transaction, we talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technology and, obviously, contractual around $30 million in revenue per year over the next three years associated with those services. As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

93.    During the February 8, 2017 conference call, Defendant Rosenberg revealed additional information on the payments the Company was to receive from Sequential as part of its divestiture agreement in an exchange with two more analysts, which was as follows:

> [Tom Roderick]
>
> Got it. I think I got it. And then this maybe related to your commentary on the ongoing piece, but just so I understand what that piece is. Because I know you were sort of highlighting – you guys were highlighting in the calculation around the financing documents that service agreement, which probably is what you're referring to with Sequential. But can you talk a little bit more about what that agreement is? How you're still supporting them as a partner? And will all of that revenue then flow into continuing

ops going forward? Or is that $32 million annual agreement, is that all just thrown into discontinuing ops, so we won't have to worry about it?

[Defendant Rosenberger]

Actually, that will be part of continuing operations. And if you want to think about the services that we provide for Sequential, remember the fact that we had software revenues associated with some of that activation business in that analytics area. And that particular IP was obviously kept by Synchronoss and Synchronoss will be providing services around that.

\* \* \*

[Samad Samana]

Hi. I actually wanted to follow-up on the $32 million payment. I'm curious, so when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement or how much of this analytics revenue that's now being put into cloud was previously in activation? I guess, I'm just trying to bridge, the math of guidance didn't change, but there is this $32 million payment now that you're getting. Help me understand where that was classified before or where you thought that would be classified into?

[Defendant Rosenberger]

No, this is new analytics revenue as we talked about. Clearly, the $32 million is part of a TSA arrangement, but it is all around the analytics.

**The Truth Begins to Emerge**

94.    On February 24, 2017, the SIRF published a report titled "Synchronoss Technologies: The Friends and Family Plan," which accused Synchronoss of concealing key aspects of its Intralinks and Sequential deals.  Per the report, Sequential and Omniglobe are one and the same.  The related-party relationship between Omniglobe and the Company was first disclosed in February 2006, at which time many of the current and former executives and directors of the Company, including Defendant Waldis, held ownership stakes in Omniglobe.  A 50% stakeholder in Omniglobe, Jaswinder Matharu, stated to the SIRF that 50% of Omniglobe is

currently "owned by friends and family of Synchronoss."  Such ownership interests, however, were not disclosed to the investing public.  The report stated, in relevant part:

> The Sequential Technology International portrayed in the company's conference calls and press releases sounds like a standard corporate buyer, chosen after some consideration among a number of different options.
>
> That's not remotely the case.
>
> To start, the Southern Investigative Reporting Foundation could not locate STI in any corporate registry or database — it's a corporate shell, formed in early November, 2016 whose website was registered by John Methfessel, a former neighbor of Stephen Waldis and an early-stage Synchronoss investor.
>
> * * *
>
> So what is Omniglobe International?
>
> It's a business process outsourcing company (often abbreviated to "BPO") that handles non-essential tasks for Synchronoss' Activation unit. Specifically, through offices in the Philippines and India, Omniglobe provides phone activation customer service for Synchronoss' AT&T contract.
>
> In its June 2006 initial public offering prospectus, Synchronoss disclosed that Omniglobe was a related party, a legal term of art that in this case means that four of its officers had an investment in Omniglobe, and would benefit financially from doing business with it. (As detailed on page 74 of the prospectus, then-CEO Waldis had a 12.23 percent "indirect equity interest in Omniglobe," former chief financial officer Lawrence Irving and former chief technology officer David Berry both had 2.58 percent and current president and chief operating officer Robert Garcia had 1.29 percent.)

95.    On this news, the price per share of Synchronoss stock at closing fell $0.37, or 1.1%, from the previous day's closing price to close at $30.49 per share on February 24, 2017.

96.    On February 27, 2017, the Company filed with the SEC its annual report for the year ended December 31, 2016 on a Form 10-K signed by Defendants Waldis, Rosenberger, Hovespian, Cadogan, Hopkins, McCormick, and Moore ("2016 10-K").  The 2016 10-K reaffirmed the financial results announced in the Company's press release issued on February 8,

2017.  The 2016 10-K also revealed that on December 22, 2016, the Company had "entered into a non-exclusive perpetual license agreement with [Sequential Technology International Holdings, LLC (which owns 70% of Sequential)], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software."  Oddly, this $9.2 million software license was not mentioned in the February 8, 2017 earnings call the Company held, despite Company management being asked numerous questions regarding payments the Company received from Sequential.  The $9.2 million fee was a considerable help to Synchronoss' Cloud segment revenue and profit margin, also providing for a vast majority of the Company's overall profits and earnings per share.  Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2016 10-K.

97.     On this news, the price per share of Synchronoss stock fell $1.80, or 5.9%, from the closing price the previous day the market was open to close at $28.69 per share on February 27, 2017.  By the close of market on February 28, 2017, the price per share of Company stock had fallen even more to $27.08.

98.     On April 6, 2017, the Company filed the 2017 Proxy Statement with the SEC.  The 2017 Proxy Statement failed to disclose that: (1) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (2) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (3) the newly-acquired Intralinks was underperforming; (4) the Company's integration of other

acquisitions was underperforming; (5) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (6) as such, the Company's guidance was overstated; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**The Truth Fully Emerges**

99.    On April 27, 2017, the Company issued a press release announcing management changes.  The Company disclosed that Defendant Hovsepian, the Company's CEO since its acquisition of Intralinks, would be leaving the Company "to pursue other interests" and that Defendant Frederick, the Company's CFO, would also be leaving "to pursue other interests." Additionally, the Company admitted that it "expects total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance. Operating margins are expected to be 8% to 10%, which are less than previously announced guidance." Defendant Waldis further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."   The press release moreover announced that Defendant Waldis would assume the role of Company CEO once again.

100.    After making these disclosures, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017, on unusually heavy trading volume.

101.    On May 12, 2017, the Company filed with the SEC a notification of its inability to file its quarterly report for the quarter ended March 31, 2017 on Form 10-Q with the SEC.

102.    On May 15, 2017, the Company issued a press release stating that the Company needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017

because, *inter alia*, Defendant Waldis and newly appointed CFO Lawrence Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, which they did, and that its independent auditor subsequently advised that additional reviews by Defendant Waldis and Mr. Irving were needed, which the Company is in the process of completing.

103.    The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

104.    On May 22, 2017, the Company issued a press release that stated that on May 16, 2017 it received notice from the Listing Qualifications Department of the NASDAQ.  The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017…"

105.    Due to this yet additional bad news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

106.    On June 13, 2017, the Company filed a Form 8-K with the SEC announcing that the Company had concluded it would restate two years' worth of financial statements, stating that "the Company's previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods . . . should be restated and should no longer be relied upon."  The Form 8-K noted that "certain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions.  The Company has determined that revenues from each of the applicable

transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting." Moreover, "[i]n connection with the impact of the . . . errors, the Company also concluded that certain related expenses recognized in the Relevant Periods will be reversed." Synchronoss additionally admitted, "The Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016. It is possible the Company may identify additional material weaknesses."

107.    On this news, the price per share of Synchronoss stock fell $0.87, or 7.1%, from the previous day's closing price to close at $11.26 on June 14, 2017.

108.    The statements referenced in ¶¶ 76-93 above were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the

newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company failed to maintain internal controls; and (12) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

109.    The statements referenced in ¶¶ 96 and 98 above were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, Defendants failed to disclose that: (1) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (2) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (3) the newly-acquired Intralinks was underperforming; (4) the Company's integration of other acquisitions was underperforming; (5) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (6) as such, the Company's guidance was overstated; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**Failure to File Required Period Reports**

110.     The Company received notice from the Listing Qualifications Department of the NASDAQ on May 16, 2017 that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not yet filed its quarterly report on Form 10-Q for the period ended March 31, 2017.

111.     In response, on July 17, 2017, the Company submitted a plan to the NASDAQ detailing how the Company planned to regain compliance with NASDAQ listing requirements.

112.     On July 26, 2017, NASDAQ granted the Company an exception to file any delinquent periodic reports by November 13, 2017.

113.     On August 16, 2017, the Company received notice from the Listing Qualifications Department of the NASDAQ that the Company yet again was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not yet filed its quarterly report on Form 10-Q for the period ended June 30, 2017.  As a result of the delinquency of this filing, NASDAQ requested an update on the Company's previously accepted plan to regain compliance with NASDAQ's listing requirements.

114.     As of the date of this filing, in continued violation of NASDAQ Listing Rule 5250(c)(1), the Company has yet to file its quarterly report on Form 10-Q for the period ended March 31, 2017 and its quarterly report on Form 10-Q for the period ended June 30, 2017.

**Repurchases**

115.     The Individual Defendants caused the Company to repurchase 337,009 shares of the Company's common stock during May 2016 and June 2016 for over $11.4 million.

116.    The share prices at which the repurchases were made were artificially inflated due to false and misleading statements made by the Individual Defendants.

117.    As the Company stock was actually only worth $12.82 per share, the Company overpaid about $21 per share, overpaying over $7 million in total.

118.    The Company has failed to timely file with the SEC its form 10-Qs for the quarters ended March 31, 2017 and June 30, 2017, and has yet to file them.

119.    Therefore, the Company has failed to disclose any repurchases of the Company's common stock during the 2017 fiscal year.

## **DAMAGES TO SYNCHRONOSS**

120.    As a direct and proximate result of the Individual Defendants' conduct, Synchronoss will lose and expend many millions of dollars.

121.    Such losses include the Company's overpayment by more than $7 million for repurchasing its own stock during May and June 2016.

122.    Such expenditures include, but are not limited to, legal fees associated with the Securities Fraud Class Action filed against the Company and four of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.    Such losses include those incurred by the Company for entering related party transactions alleged herein that were unfair to the Company and entered under unfavorable terms.

124.    Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and the costs to the Company to restate two entire years' worth of financial statements.

125.    As a direct and proximate result of the Individual Defendants' conduct, Synchronoss has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

126.    Plaintiff brings this action derivatively and for the benefit of Synchronoss to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Synchronoss, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

127.    Synchronoss is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff is, and has been since before the beginning of the Relevant Period, a Synchronoss shareholder.  Plaintiff will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

130.    A pre-suit demand on the Board of Synchronoss is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five Individual Defendants: Waldis, Cadogan, Hopkins, McCormick, and Moore (collectively, the "Directors").

Plaintiff only needs to allege demand futility as to three of the five Directors that are on the Board at the time this action is commenced.

131.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact while all of them engaged in insider sales based on material non-public information netting proceeds of over $8 million and at the same time caused the Company to repurchase over $11.4 million worth of its own stock, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, six of the Individual Defendants, including all five of the Company's Directors, collectively sold over $9.4 million dollars worth of Company stock at artificially inflated prices based on inside material information.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.    Additional reasons that demand on Defendant Waldis is futile follow.  Defendant Waldis is the Company's Chief Executive Officer and Chairman of the Board, and is thus, as the Company admits, a non-independent director.  Indeed, the Company compensated him with over

$5.7 million in 2016.  Defendant Waldis was ultimately responsible for the vast majority of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed, and including many of which he personally made.  Additionally he liable for causing the Company to fail to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company.  His insider sales before the fraud was exposed, which yielded over $4.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Furthermore, Defendant Waldis is a defendant in the Securities Fraud Class Action.  Defendant Waldis's large Company stock holding, worth over $28 million just prior to the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.  Finally, Defendant Waldis conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Waldis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Cadogan is futile follow. Defendant Cadogan was compensated with over $283,000 in 2016, so lacks independence. His insider sales before the fraud was exposed, which yielded over $1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant Cadogan's large Company stock holding, worth over $10 million just prior to the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a Director and member of the Audit Committee (as well as the Compensation Committee, Business Development Committee, and the Nominating and Corporate Governance Committee), Defendant Cadogan conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. Thus, for these reasons, too, Defendant Cadogan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Hopkins is futile follow. Defendant Hopkins was compensated with over $275,000 in 2016, so lacks independence. His insider sales before the fraud was exposed, which yielded over $1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant Hopkins's large Company stock holding, worth over $2.5 million just prior to the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a Director and member of

the Audit Committee (as well as Compensation Committee and Business Development Committee), Defendant Hopkins conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein. Thus, for these reasons, too, Defendant Hopkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136. Additional reasons that demand on Defendant McCormick is futile follow. Defendant McCormick was compensated with over $248,000 in 2016, so lacks independence. His insider sales before the fraud was exposed, which yielded over $1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant McCormick's large Company stock holding, worth almost $95 million just prior to the Relevant Period, and comprising almost 7% of the Company's issued and outstanding stock, reveals his interest in keeping the Company's stock price as high as possible. As a Director and member of the Compensation Committee and the Nominating and Corporate Governance Committee, Defendant McCormick conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and

misleading statements in the 2016 10-K that are referenced herein.  Thus, for these reasons, too, Defendant McCormick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Moore is futile follow.  Defendant McCormick was compensated with over $273,000 in 2016, so lacks independence.  His insider sales before the fraud was exposed, which yielded over $1.14 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Defendant Moore's large Company stock holding, worth almost $3 million just prior to the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.   As a Director and member of the Audit Committee (as well as the Nominating and Corporate Governance Committee), Defendant Moore conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Moreover, he signed, and thus personally made, the false and misleading statements in the 2016 10-K that are referenced herein.  Thus, for these reasons, too, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on the Board is futile follow.

139.    As described above, all of the Directors on Synchronoss' Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics.  Defendants Waldis, Cadogan, Hopkins, McCormick, and Moore received proceeds in excess of $8 million as

a result of insider transactions executed during the Relevant Period. This alone prevents the existence of a majority of disinterested directors on the Board.  Therefore, demand in this case is futile, and excused.

140.    Additionally, the demand in this case is excused because the Directors, who are named as defendants in this action, are beholden to each other.  According to the 2017 Proxy Statement, the Nominating and Corporate Governance Committee "oversees a biennial self-evaluation process to analyze and review our Board's performance and the performance of each of the members of our Board."  Thus, members of this committee make decisions that directly affect other directors' participation on the Board.  All of the members on the Nominating and Corporate Governance Committee, Defendants Cadogan, McCormick, and Moore, committed especially egregious insider sales and directly made false statements, so face a substantial likelihood of liability.  Other Directors may fear retaliation by the Nominating and Corporate Governance Committee should Plaintiff's demand be accepted.  This is especially true since three members of the Board are up for election either this year or next year.  For this reason, too, demand upon the Board is futile.

141.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant McCormick and Defendant Waldis, who together own about 9% of the Company, and the latter of whom was most responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to correct those false and misleading statements.

142.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.   Thus, any demand on the Directors would be futile.

143.   Synchronoss has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Synchronoss any part of the damages Synchronoss suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

144.   The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.   Accordingly, demand is excused as being futile.

145.   The acts complained of herein constitute violations of fiduciary duties owed by Synchronoss' officers and directors, and these acts are incapable of ratification.

- 50 -

146.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Synchronoss.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Synchronoss, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

147.    If there is no directors' and officers' liability insurance, then the Directors will not cause Synchronoss to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

148.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least three of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 51 -

150. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

151. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

152. Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since

2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company failed to maintain internal controls; and (12) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

153.    Moreover, under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (2) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (3) the newly-acquired Intralinks was underperforming; (4) the Company's integration of other acquisitions was underperforming; (5) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (6) as such, the Company's guidance was overstated; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

154.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 and 2017 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 and 2017 Proxy Statements, including but not limited to,

election of directors, approval of officer compensation, and appointment of an independent auditor.

155.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

156.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Synchronoss.  Not only is Synchronoss now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Synchronoss by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $11.4 million of its own shares on the open market at artificially-inflated prices, damaging Synchronoss by millions of dollars.

159.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

160.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Synchronoss not misleading.

161.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Synchronoss.

162.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

163.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K filed

with the SEC during the Relevant Period, including Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore, who signed the 2016 10-K.

164.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

165.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    The Individual Defendants, by virtue of their positions with Synchronoss and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Synchronoss within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Synchronoss to engage in the illegal conduct and practices complained of herein.

168.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Synchronoss' business and affairs.

171.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Synchronoss.

173.    In breach of their fiduciary duties owed to Synchronoss, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company failed to maintain internal controls; and (12) as a result of the

foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

174.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.  A vast majority of the Individual Defendants engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact and while they caused the Company to engage in repurchasing its own stock.

175.    The Individual Defendants also breached their fiduciary duties by failing to maintain internal controls.

176.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Synchronoss' securities and disguising insider sales.

177.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls

were not adequately maintained, or acted with reckless disregard for the truth, in that they caused

the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate

internal controls, even though such facts were available to them.  Such improper conduct was

committed knowingly or recklessly and for the purpose and effect of artificially inflating the

price of Synchronoss' securities and engaging in insider sales.

178.    These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

179.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Synchronoss has sustained and continues to sustain significant damages.

As a result of the misconduct alleged herein, the Individual Defendants are liable to the

Company.

180.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

182.    By their wrongful acts and false and misleading statements and omissions of

material fact that they made and/or caused to be made, the Individual Defendants were unjustly

enriched at the expense of, and to the detriment of, Synchronoss.

183.    The Individual Defendants either benefitted financially from the improper

conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to

the false and misleading statements, or received bonuses, stock options, or similar compensation

from Synchronoss that was tied to the performance or artificially inflated valuation of

Synchronoss, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.    Plaintiff, as a shareholder and a representative of Synchronoss, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

185.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Synchronoss, for which they are legally responsible.

188.    As a direct and proximate result of the Individual Defendants' abuse of control, Synchronoss has sustained significant damages.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Synchronoss has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

189.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Synchronoss in a manner consistent with the operations of a publicly-held corporation.

192.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Synchronoss has sustained and will continue to sustain significant damages.

193.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

194.    Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Synchronoss to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.  In addition, the Individual Defendants caused the Company to repurchase

shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

197.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Synchronoss, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Synchronoss;

(c)    Determining and awarding to Synchronoss the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Synchronoss and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Synchronoss and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Synchronoss to nominate at least three candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Synchronoss restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 14, 2017          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ  07079
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771

Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

VERIFICATION

I, Patricia Thieffry, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ⎯14th⎯ day of September, 2017.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Patricia Thieffry