**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE SYNCHRONOSS<br>TECHNOLOGIES, INC. SECURITIES<br>LITIGATION<br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Civil Action No. 17-7173 (FLW) (LHG)<br><br>**OPINION** |

<u>**WOLFSON, Chief Judge**</u>:

In this consolidated class action, shareholder Plaintiff Lisa LaBoeuf ("Plaintiff") alleges, *inter alia*, that when Synchronoss divested its Activation business, a component of the Company which provides mobile handset activation and network services, the then-Synchronoss Board of Directors breached its fiduciary duties to the Company and its shareholders by approving the sale. Presently before the Court is a motion by Defendants Stephen G. Waldis ("Waldis), William J. Cadogan ("Cadogan"), Thomas J. Hopkins ("Hopkins") (collectively, "Director Defendants"), James M. McCormick ("McCormick"), and Donnie M. Moore ("Moore") (collectively, together with Director Defendants, "Defendants") and Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), to dismiss Plaintiff's Amended Verified Shareholder Derivative Complaint ("Amended Complaint") pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6). Previously, I granted Defendants' first motion to dismiss Plaintiff's complaint, granting Plaintiff leave to amend, after finding that the complaint did not adequately allege that Plaintiff's failure to make demand on the Board was excused. Plaintiff filed an Amended Complaint and now, Defendants, once again, move to dismiss Plaintiff's claims for failure to make

1

demand on the Board, and failure to sufficiently allege that making demand on the Board was futile. For the reasons stated herein, Defendants' motion is **GRANTED**. Plaintiff has not adequately alleged facts demonstrating that a majority of the Board of Directors, as it existed at the time the Amended Complaint was filed, would not have acted in a disinterested and independent fashion in the face of demand.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Synchronoss and the Board of Directors

The following allegations are taken from the Amended Complaint ("Am. Compl.") and are assumed true for the purposes of this motion to dismiss. *See* ECF No. 79. The facts and procedural history of this case were set forth in detail in the Prior Opinion, and the crux of the Amended Complaint's factual allegations, particularly with regard to the circumstances surrounding the sale of Synchronoss's Activation business and the relationship between the Company's board members at the time, are largely unchanged. Accordingly, I will not recount them in detail, here, and only briefly summarize the most salient facts, and incorporate the new allegations, when necessary.

Synchronoss, a Delaware corporation, is a global software and services company that provides services for mobile transformation of business. Am. Compl. ¶31. The most consistently profitable line of the Company's business was the Activation business, through which the Company provides "mobile handset activation and network services to mobile phone carriers around the world." *Id*. at ¶4. In 2017, at the time Plaintiff initiated this lawsuit, Synchronoss had a five-member board of directors consisting of Waldis, Cadogan, Hopkins, McCormick, and Moore (the "Prior Board"). *Id*. at ¶¶32-36. On November 16, 2017, Synchronoss announced that Glenn Lurie, who had previously been CEO of AT&T's Mobility and Consumer Operations,

would be joining the Synchronoss Board and taking over as CEO, and that Waldis would remain Chairman of the Board. *Id*. at ¶222. Since that time, Synchronoss has increased its Board of Directors to ten members. Additionally, in June 2019, McCormick and Moore both stepped down from the Company's Board of Directors. *Id*. at ¶¶33-34. Thus, at the time Plaintiff filed the Amended Complaint in July 2020, the Company's Board of Directors was made up of defendants Waldis, Hopkins, and Cadogan, and nondefendants Lurie, Frank Baker, Peter Berger, Robert Aquilina, Kristin Rinne, Laurie Harris, and Mohan Gyani (the "Current Board"). *Id*. at ¶¶191-93, 220.

**B. The Activation Divestiture**

On December 6, 2016, in a Form 8-K filed with the SEC, the Company announced that it would be divesting 70% of its Activation business. *Id*. at ¶¶6-7. Synchronoss revealed that it had formed a new entity, Sequential Technology International ("STI") and transferred the bulk of the assets comprising the Activation business to that entity. *Id*. at ¶42. Further, Sequential Technology Holdings, Inc ("Sequential") and Synchronoss had entered into a purchase agreement, pursuant to which Sequential would purchase a 70% interest in STI for a cash payment of $146 million. *Id*. Synchronoss would retain 30% interest in STI. *Id*. The same day, Synchronoss announced that it had bought Intralinks, a tech company, for $821 million. *Id*. at ¶¶53,106. In connection with the Sequential transaction, Synchronoss and Sequential also entered into a "non-exclusive perpetual license agreement," under which Sequential obtained a license for certain analytics software products owned by Synchronoss. *Id*. at ¶77-80. Sequential paid Synchronoss a $9.2 million licensing fee, which the Company included as revenue in the fourth quarter of 2016, but the Company allegedly did not disclose that fact until months later in February 2017. *Id*.

Initially, the public at large was purportedly unaware of who made up the buyers behind Sequential. It would later be publicly revealed, that Sequential was previously known as Omniglobe International LLC ("Omniglobe"), an entity affiliated with friends and family of Synchronoss management and had been renamed prior to the Activation transaction. *Id*. at ¶9, 45. According to Plaintiff, Omniglobe was referred by name in the Prior Board's presentations leading up the transaction, and the Prior Board was aware that it was run by friends and family of Synchronoss insiders. *Id*. at ¶95. Prior to founding Synchronoss, Plaintiff claims that Waldis owned shares of Omniglobe, through an entity called Rumson Hitters LLC. ("Rumson Hitters") which had been renamed prior to the Activation transaction. *Id*.

In February 2017, in an article published by the Southern Investigative Reporting Foundation ("SIRF"), it was revealed that at the time of the divestiture, Rumson Hitters owned 50% of Sequential/Omniglobe, and an individual named Jaswinder Matharu owned the other half. *Id*. at ¶9, 68, 70-75. Before Synchronoss sold shares to the public, a group of four Synchronoss insiders used to own, indirectly, through their shares of Rumson Hitters, a total of 18.68% of Omniglobe: then-officers, Waldis (then CEO), Lawrence Irving ("Irving") (then Chief Financial Officer), David E. Berry ("Berry")(then Chief Innovation Officer and Executive Vice President), and Robert Garcia ("Garcia")(then Chief Operating Officer and President). *Id*. at ¶41-46. According to Synchronoss's SEC filings in connection with its initial public offering ("IPO"), Waldis and the others sold their interests in Rumson Hitters, a decade earlier, in May 2006, for the same price that they had paid, shortly after Synchronoss filed its IPO. *Id*. at ¶¶50. Their shares were allegedly sold to John Methfessel, Jr., Paul Claussen, and Tom Miller, who are, according to Plaintiff, friend and neighbors of Waldis and his family. *Id*. at ¶¶46, 50, 86. Thus, Plaintiff alleges that although Waldis, Irving, Berry, and Garcia no longer owned shares in Rumson Hitters at the

time Synchronoss entered into the transaction with OmniGlobe, the transaction was problematic because Synchronoss sold the Activation business to friends and family of corporate insiders, *i.e*, Methfessel, Claussen, and Miller.

Plaintiff further alleges that one of the key motivations behind the transaction was "to help people other than shareholders," including Waldis' friends and family. *Id*. at ¶90. At a September 30, 2016 meeting of the Business Development Committee of the Prior Board, Waldis stated that "one of the reasons 'the potential purchaser' it had been working with (Sequential), was the 'best choice' was its 'commitment to several of the company's vice presidents to take a leadership role at the purchaser.'" *Id*. (internal quotation marks omitted). The Prior Board was also allegedly motivated by "pleasing AT&T." *Id*. at ¶91. A slide from a November 30, 2016 presentation to the Prior Board provides an "Executive Summary" and lists the goal of having the acquiring company be "favorably viewed by AT&T," and notes that "AT&T/Lurie highly supportive of deal/structure." *Id*. Synchronoss's current CEO, Lurie was, at the time, President and CEO of AT&T's Mobility and Consumer Operation. *Id*.

## C. The Company's Restated Financial Statements

In the same February 2017 Form 10-K, the Company allegedly revealed that contemporaneous with the Activation Divestiture, it had executed "a non-exclusive perpetual license agreement with [Sequential], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software." *Id*. at ¶77. The Company also stated that it had "reclassified revenue historically derived from Cloud Analytics offering to the Cloud category." *Id*. at ¶78. Allegedly, the $9.2 million in revenue allowed the Company to meet its guidance for "Cloud" revenue for the fourth-quarter. *Id*. at ¶79.

After the filing of the Company's February 2017 Form 10-K, and the disclosure of the $9.2 million licensing fee, Synchronoss's stock price dropped almost 6%. *Id.* at ¶ 82.

In May 2017, the Company announced via press release that it needed time "to comply with the Company's internal controls and procedures and to review certain aspects of the Company's financial statements and corresponding notes for inclusion in the Form 10-Q." *Id.* at ¶111. Then, on June 8, 2017, the Company announced that it would file two years of restated financial statements because, its Audit Committee, which consisted of Cadogan, Hopkins and Moore, had concluded that "certain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions. The Company has determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting." *Id.* at ¶113. Moreover, the Company also announced that "previously issued financial statements for the fiscal years December 31, 2016 and 2015 and the respective quarterly periods (collectively, the "Restatement Period") should be restated and should no longer be relied upon." *Id.* In October 12, 2017, the Company announced that it was extending the Restatement Period back to December 31, 2014. *Id.* at ¶114

On July 2, 2018, more than a year after announcing the need to restate its financials, Synchronoss issued a press release announcing that it had completed the Restatement and filed its Form 10-K for 2017. *Id.* at ¶119. Among other things, the Form 10-K revealed that as part of the sale to Sequential, Synchronoss provided a guarantee to Goldman Sachs for $30 million of the $40 million in senior debt extended by Goldman to Sequential. *Id.* at ¶¶16, 64. The Company's public statements about the deal, at the time, omitted the information about the guarantee, and it was revealed for the first time in the Form 10-K. *Id.* at ¶141.

The press release summarized the issues giving rise to the need to restate the Company's financials. *Id*. Among other things, the press release identified that there were issues with how the Company recognized revenue related to hosting services, master services contracts, and licensing fees entered into as part of acquisitions and divestitures, including the Activation Divestiture and the $9.2 million perpetual license. *Id*. at ¶¶119, 131. The 2017 Form 10-K similarly states that: "As of December 31, 2017, management has identified **pervasive material weaknesses** in our internal control processes that involve the control environment, risk assessment, control activity, information and communication and monitoring components of the COSO framework." *Id*. at ¶121 (emphasis in original). The Company acknowledged that "the **board of directors** and senior management **establish the tone at the top** regarding the importance of internal controls and management reinforces expectations at the various levels of the company," and elaborated on the material weaknesses in the Company's internal controls. *Id*. (emphasis in original)

The Restatement revealed that the Company's revenues, net income, and earnings per share for 2014 through 2016, were much lower than previously reported. *Id*. at ¶¶122-128. Synchronoss's cumulative revenue for 2014 through 2016 was reduced nearly $180 million from $1.21 billion to $1.03 billion, or nearly 15%. The Company's revenues were reduced by 16%, 9.6%, and 8.1% for 2014, 2015, and 2016, respectively. *Id*. at ¶123. The impact on Synchronoss's net income was even more profound, resulting in a loss. *Id*. at ¶¶124-125. Although the Company had previously reported "net income from operations from 2014 through 2016 of $93.5 million, Synchronoss [allegedly] incurred a loss of $40 million during that time period, a 143% decrease." *Id*. at ¶125. Plaintiffs allege that these losses were due to the failure of the Prior Board, in particular

the members of the Audit Committee, to exercise adequate oversight over the Company's financials. *Id*. at ¶¶128-132.

**D. The Alleged Insider Trading**

Plaintiff also alleges that Waldis, Moore, Cadogan, and Hopkins sold millions of dollars' worth of Synchronoss stock and received substantial profits between 2014 and 2016, when Synchronoss was misstating its revenues, and between September 2016, when the Board first began discussing the potential Activation Divestiture, and February 27, 2017, when Plaintiff alleges that Sequential's true identity was revealed and Synchronoss's stock price collapsed. *Id*. ¶145-166.

Between January 2014 and December 2016, the three-year time period during which the Company was allegedly misstating its revenues, Defendants allegedly sold an aggregate amount of over $70 million worth of Synchronoss stock. *Id*. at ¶¶159-166. According to Plaintiff, despite each Defendant serving on the Company's Board for more than a decade, Hopkins, Cadogan, and Moore, did not make a single sale prior to 2014; similarly, McCormick did not make any sales from August 30, 2011 until November 4, 2014. Moreover, none of the Defendants purchased Synchronoss stock during this time. *Id*. at ¶159.

On February 4, 2016, Synchronoss announced that the Board of Directors had approved a share repurchase program, under which the Company was permitted to purchase up to $100 million of its outstanding common stock. *Id*. at ¶145. The press release, quoting Waldis, states:

> "As we begin 2016, we believe that Synchronoss has a very strong market position and financial profile, in addition to a large and expanding addressable market opportunity. We expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow. . . . In addition to investing in our strategic growth initiatives, we believe our new share repurchase program is an excellent way to leverage our strong balance sheet and cash flow in order to enhance long-term shareholder value."

*Id*. As a result, the Company repurchased approximately 10.3 million shares, at average prices ranging from $30.00 to $35.64 per share, resulting in aggregate repurchases of $40 million. *Id*. at ¶¶147-148. Moore, Cadogan, Hopkins, and Waldis, all allegedly sold shares as part of the share repurchase program. *Id*. at ¶166. Plaintiff alleges that during the share repurchase program, the true value of the Company's common stock was $11.26, the price per share of the Company's common stock when the truth emerged, and thus, Defendants caused Synchronoss to overpay by $28.5 million for repurchases of its own stock. *Id*. at ¶148. Moreover, in the third quarter of 2016, following the repurchase program, the Company borrowed money to offset a decrease in liquidity allegedly caused by the program. *Id*. at ¶149.

Plaintiff alleges that between 2016, following the announcement of the Activation Divesture, and 2017, prior to the reveal that Omniglobe was behind Sequential, Waldis sold 9.6% of his shares; Moore, sold 48.3% of his shares; Hopkins sold 43.4% of his shares and Cadogan sold 10.5% of his shares. *Id*. at ¶154-157. With the exception of Waldis, none of the defendants has made a single sale since the SIRF article was published in February 2017. *Id*. at ¶158.

**E. The SIRIS Deal**

Between April 27, 2017 and May 4, 2017, Siris Capital Group, LLC ("Siris") purchased nearly six million shares of Synchronoss common stock, constituting approximately 13% of the Company's outstanding shares, which positioned Siris as the Company's largest shareholder. *Id*. at ¶¶19, 169. Then, Siris Co-Founder Frank Baker met with Waldis on May 4, 2017, and expressed Siris' interest in acquiring Synchronoss. *Id*. ¶¶19, 22. Prior to engaging in negotiations, Siris signed a non-disclosure agreement ("NDA"),which provided, among other things, that Siris was prohibited "from taking certain actions during the time period beginning on May 19, 2017 and ending on the earlier of (x) the termination of the Non-Disclosure Agreement, (y) the execution of

a definitive agreement relating to a Potential Transaction and (z) February 19, 2018." *Id*. at ¶¶171-

172.  Specifically Siris was prohibited from

> directly or indirectly, (A) acquiring any voting securities of
> the Company (including any derivatives, options, puts and
> calls) or (B) soliciting any proxies to vote, or advising any
> person with respect to the voting of, any voting securities of
> the Company (excluding, for the avoidance of doubt, in the
> case of clause (B), any voting securities beneficially owned
> by Siris Capital Group or its affiliates).

*Id*. at ¶172.   On June 22, 2017, Siris made an all-cash offer to purchase Synchronoss common

stock  at $18.00 per share, a 69% premium at over the prior day's closing price of $10.65.  *Id*. at

¶173.

In September 2017, the Board of Directors rejected Siris' offer.  *Id*. at ¶177.  In a press

release, the Board explained that

> Siris   Capital   Partners   ("Siris")   recently   informed
> Synchronoss that Siris would terminate its discussions
> regarding a potential transaction unless Synchronoss agreed
> to negotiate exclusively with Siris. Given the status of the
> process and the continued interest from other parties,
> Synchronoss has determined that entering into an exclusivity
> agreement with Siris at this time is not in the best interest of
> the Company's shareholders. The Company remains in
> active discussions with multiple parties and has received
> what the Board believes to be attractive proposals compared
> to the most recent proposal from Siris.

*Id*. at ¶177.

A few weeks later, however, on October 5, 2017, the Board of Directors announced that

"the Company and Siris determined to restart discussions regarding a potential transaction. . . . .

Following those discussions, the Board of Directors determined that it was in the best interest of

Synchronoss shareholders to enter into an agreement with Siris providing for a limited period of

exclusivity to allow for negotiation of definitive agreements." *Id*. at ¶178.  Following the renewed

negotiations, Synchronoss and Siris and struck a two-part deal. *Id*. at ¶¶23-26, 179-183.

First, Synchronoss sold the newly acquired Intralinks to Siris for approximately $1 billion

*Id*. at ¶24, 179.  The $1 billion sale price was $200 million more than the $821 million Synchronoss

paid for Intralinks in 2016, when Synchronoss outbid Siris to purchase Intralinks.  *Id*. at ¶¶5, 24,

179.  Siris subsequently re-sold Intralinks, allegedly profiting $500 million from that transaction.

*Id*. at ¶227.

Second, Siris made a $185 million investment in convertible preferred equity of

Synchronoss, which was converted into almost 20% of the Company's common stock.  *Id*. at ¶¶25,

179.  As part of the deal, Siris also secured significant rights pertaining to Synchronoss's

governance and operations, pursuant to an Investor Rights Agreement, including the right to

appoint two members to Synchronoss's Board, and millions in dividend payments as the

investment carried an annual interest rate of 14.5%.  *Id*. at ¶179.  The deal closed on February 15,

2018, and that same day, Synchronoss announced that Frank Baker and Peter Berger, each a Co-

Founder and Managing Partner of Siris, joined the Company's board of directors.  *Id*. at ¶182.  In

April 2018, Robert Aquilina, an Executive Partner at Siris, also joined the Synchronoss Board

pursuant to the Investor Rights Agreement which provided, *inter alia*, that four independent

directors would be "agreed upon by Synchronoss and [Siris]."  *Id*. at ¶223 n.9.

Plaintiff alleges that the Siris deal was a poor one for Synchronoss's shareholders and was

motivated by protecting the Board from a proxy contest, rather than the Company's best interests.

*Id*. at ¶¶21, 26-27. As reflected in Synchronoss's 2017 Proxy Statement, all of the Company's

Directors and Officers owned approximately 10.5% of Synchronoss's shares, while three

institutional investors owned approximately 24.8% of the Company's shares (not including Siris'

recent stake). *Id.* Plaintiff alleges that the Director Defendants were threatened by the institutional investors' stakes, and the sale of Intralinks and the $185 million deal with Siris allegedly permitted Defendants to maintain their Board seats at the Company while providing no benefit to shareholders. *Id.* at ¶183.

### A. The Prior Opinion

In an opinion dated November 26, 2019 ("Prior Opinion"), I assessed whether Plaintiff's initial complaint adequately alleged that demand on the Prior Board was futile, and therefore excused. First, I addressed Plaintiff's claims that Waldis stood on both sides of the Activation transactions, thus, he was interested in the transaction, and that McCormick and Moore were beholden to Waldis, such that they could not act independently or disinterestedly. Prior Opinion at 18-26. I concluded that Plaintiff had not alleged particularized facts creating reasonable doubt that Waldis could act in a disinterested manner in face of demand, and that Plaintiff has failed to allege facts under which it is reasonably conceivable that either Moore or McCormick lacked independence from Waldis. *Id.* at 22, 26.

Next, I turned to Plaintiff's argument that Defendants faced a substantial likelihood of personal liability for breaches of the duty of loyalty and disclosure stemming from (1) oversight failures in ignoring the glaring red flags relating to the Activation Divestiture and the Company's misleading disclosures relating to the Activation Divestiture; (2) oversight failures relating to the accounting restatement; and (3) insider trading on the basis of material non-public information in violation of Delaware law. I concluded that Plaintiff had failed to adequately allege demand futility with respect to all of the claims, except the breach of the duty of disclosure claim, and limited Plaintiff to pursuing the alleged breach fiduciary duty of loyalty premised solely on Defendants' failure to disclose material information regarding the financial terms of the Activation

Divestiture, the omissions regarding the $9.2 million licensing fee revenue, and their impact on the Company's Fourth Quarter 2016 financial results. Prior Opinion at 41-42.

Thereafter, Defendants filed a motion for reconsideration. *See* ECF No. 65. On reconsideration, I concluded that a majority of the Defendants could not be held liable for the allegedly misleading disclosures because Plaintiff had only alleged facts suggesting that Waldis was responsible for the dissemination of the misleading information and had not alleged that any of the other defendants had any involvement with the misinformation disseminated on the investor calls, the press release, or the SEC filings. *See* ECF No. 75, June 12, 2020 Opinion ("Reconsideration Opinion") at 12-14. Having dismissed Plaintiff's only remaining claim, I dismissed Plaintiff's Complaint, and granted Plaintiff leave to amend her allegations regarding demand futility. *Id*. at 15. Plaintiff did so; now, Defendants, once again, move to dismiss based on Plaintiff's failure to make a pre-suit demand as required by Federal Rule of Civil Procedure 23.1.

## II.    LEGAL STANDARD

### A.  Demand Futility

Under Federal Rule of Civil Procedure 23.1, "a shareholder may file a derivative suit against the board of directors to claim enforcement of a right of the corporation where the corporation has failed to assert that right." *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007). Rule 23.1 sets forth a heightened pleading standard, requiring "a plaintiff to plead with particularity either the efforts made to spur directors to take the action sought, and why these efforts were unsuccessful, or the reasons why no effort was made to demand action from the board." *Id*. The purpose of the demand requirement is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in

the belief that its best interests will be promoted by not insisting on such right." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991).

A federal court hearing a shareholder derivative suit involving state law claims must "apply the federal procedural requirement of particularized pleading but apply state substantive law to determine whether the facts demonstrate demand would have been futile and can be excused." *Id.* at 98-99. Here, Synchronoss is a Delaware corporation, and thus, Delaware law governs the substantive inquiry into demand futility.

Delaware courts utilize two tests for evaluating whether making a pre-suit demand would have been futile and is therefore excused: the *Aronson* test and the *Rales* test. Courts apply the test set forth by the Delaware Supreme Court in *Aronson v. Lewis*, 473 A.2d 805, 809 (Del. 1984), when "a *decision* of the board of directors is being challenged in the derivative suit." *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (emphasis in original). However, when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something," the *Rales* test applies. *Id.* at 933-34, 934 n.9.

Under the *Aronson* test, the derivative complaint must plead particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000) (quoting *Aronson*, 473 A.2d at 814). If either prong is satisfied, then demand is excused. *Id.* at 257. Under the *Rales* test, demand is excused only where "particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at

934.  Under either test, a director may be interested if he or she is exposed to a "substantial likelihood of liability" for his or her involvement in the transaction at issue. *Aronson*, 473 A.2d at 815; *Kohls v. Duthie*, 791 A.2d 772, 782 (Del. Ch. 2000) (explaining that under *Rales* "when there is no challenge to a business judgment, as is the case here, the question becomes whether the director faces a substantial threat of personal liability due to his alleged conduct or lack thereof.").

Like on the prior motion to dismiss, neither party has specifically couched their arguments within either the *Aronson* or *Rales* frameworks; rather, they agree, consistent with Delaware law, that both tests look to whether the Board was disinterested and independent with respect to the transactions at issue, and whether a majority of the Directors face a substantial likelihood of personal liability for the claims alleged. *See* Def. Br. at 17 ("Whether applying *Aronson* or *Rales*, a typical theory advanced by derivative plaintiffs claiming a majority of the board is not disinterested or independent is to assert that the directors face a substantial likelihood of liability with respect to the transactions at issue."); Pl. Br. at 17 ("the fundamental question in evaluating demand futility is whether the board can exercise its business judgment on the corporate behalf in considering demand" (internal quotation marks and citations omitted)); *see also In re infoUSA, Inc. S'holders Litig.,* 953 A.2d 963, 986 (Del. Ch. 2007) (noting that both tests boil down to whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith"); *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry.... Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."). Accordingly, consistent with Delaware law, this Court assesses whether Plaintiff has alleged sufficient facts to demonstrate

that the Director Defendants face a substantial likelihood of personal liability for the claims alleged and whether the Non-Defendant Directors are disinterested and independent.[1]

## B.     Motions to Dismiss 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

---

[1]     Plaintiff does not argue – nor is there a viable argument to be made – that the non-Defendant directors, all of whom joined the Board after the alleged wrongdoing in the Amended Complaint occurred face any likelihood of liability for the claims alleged.  *See In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1128 (N.D. Cal. 2015) (applying Delaware law and explaining that "[a]ny further amended complaint would have to plead demand futility against Yahoo's current board of directors . . .  and demand plainly could not be excused given that . . all of Yahoo's current directors joined the board after the events at issue in this litigation."); *In re Am. Int'l Grp., Inc. Derivative Litig.,* 700 F. Supp. 2d 419, 440 (S.D.N.Y. 2010) (applying Delaware law and finding that "the actions in question occurred before Liddy, Johnson and Dammerman joined the Board and, accordingly, there are no grounds to create a reason to doubt their disinterestedness with respect to these claims.")

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted);*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

III.    <u>DISCUSSION</u>

Defendants move to dismiss the Complaint on two grounds: for failure to assert a pre-suit demand as required under Section 327 of Delaware General Corporation Law and failure to adequately plead demand futility under Federal Rule of Civil Procedure 23.1.

## A. Whether Demand Futility Must Be Assessed with Respect to the Prior Board or the Current Board

As an initial matter, the parties dispute whether demand futility should be examined at the time the action was commenced or at the time an amended complaint was filed; in other words, whether Plaintiff is required to demonstrate that demand is futile with respect to the Current Board, or the Prior Board.

The Supreme Court of Delaware has previously addressed this question, applying Delaware Chancery Court Rule 23.1, which imposes a demand futility requirement similar to that required by the federal rule, in *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006). *Compare* Del. Ch. Ct. R. 23.1(a) ("In a derivative action . . . [t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.") *with* Fed. R. Civ. P. 23.1(b)(3) (derivative complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort"). In *Braddock*, the Delaware Supreme Court explained that a company's board of directors has statutory authority to manage the corporation's business and affairs, and that "[w]hen a derivative action is pending, a board comprised of new directors who are under no personal conflict with respect to prosecution of a pending derivative claim ... may cause the corporation to act in a number of ways with respect to that litigation," including, for example, "take control of the litigation by becoming realigned as the party plaintiff; move to dismiss the action as not in the corporation's best interest; permit the plaintiff to carry the litigation forward; or appoint a special litigating committee to determine what action to take." 906 A.2d at 785-786 (internal citations and quotation marks omitted). As such, the Court concluded

that when there is a change in the composition of a company's board of directors prior to the filing of amended derivative complaint, "the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry . . . as to derivative claims in the amended complaint that are not already validly in litigation." *Id*. at 786. It further elaborated that a claim is "validly in litigation" if (1) "the original complaint was well pleaded as a derivative action," (2) "the original complaint satisfied the legal test for demand excusal," and (3) "the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint." *Id*. A claim is not validly in litigation unless it "can or has survived a motion to dismiss." *Id*. at 779.

Relying on *Braddock*, Defendants argue that "Delaware law is clear that when 'a complaint is amended with permission following a dismissal without prejudice, even if the act or transaction complained of in the amendment is essentially the same conduct that was challenged in the original dismissed complaint, the Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed.'" Def. Br. at 20 (quoting *Braddock*, 906 A.2d at 786). Defendants emphasize that this "rule is well-established and has been widely applied in Delaware and the federal courts applying Delaware law." *Id*. (citations omitted). Defendant further argues that the nature of the prior dismissal has no bearing on whether demand is required to be made on the Current Board, rather, "[t]he determination of which board must be referenced in evaluating demand futility . . . is by definition central to Delaware's substantive demand doctrine." ECF No. 97, Def. Reply Br. at 8.

In response, Plaintiff argues that while Defendants would be correct if this case were proceeding in Delaware state court, "here, federal law dictates procedure." ECF No. 92, Pl. Opp. Br. at 38 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Plaintiff maintains that under

*Braddock*, an "amended complaint must demonstrate that demand would be futile as to the board of directors constituted at the time the amended complaint is filed, unless the original complaint's claims are validly in litigation." *Id*. at 38-39. Plaintiff contends that "whether a claim is validly in litigation is an inherently procedural determination," which must be made by this Court. *Id*. at 39. In that regard, Plaintiff highlights Third Circuit case law that a dismissal without prejudice is "neither final nor appealable because the deficiency may be corrected by the plaintiff without affecting the cause of action." *Id*. at 39 (citing *Borelli v. City of Reading*, 532 F.2d 950 (3d Cir. 1976)). Thus, in Plaintiff's view, "[b]ecause this Court dismissed Plaintiff's original complaint without prejudice and with leave to amend," the original claims are still "validly in litigation" and "the [Prior] Board remains the operative Board for purposes of the demand futility analysis." *Id*. at 40. Alternatively, Plaintiff argues that she has adequately alleged demand futility regardless of which board of directors is considered. *Id*. at 35-37.

I am not persuaded by Plaintiff's arguments. Plaintiff is correct that in diversity cases, such as this one, federal law governs matters of procedure, while state law governs the substantive matters, including the demand futility analysis. *See Kamen*, 500 U.S. at 96 ("the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not "procedure." (citations omitted)); *see also Kanter*, 489 F.3d at 176 (explaining that courts "apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate demand would have been futile and can be excused." (citations omitted)). "Although Federal Rule of Civil Procedure 23.1 provides the procedural vehicle for addressing the adequacy of a shareholder derivative complaint, '[t]he substantive requirements of demand are a matter of state law.'" *Hirschfeld v. Beckerle*, 405 F. Supp. 3d 601, 606 (D.N.J. 2019)

(quoting *Freedman v. Redstone*, 753 F.3d 416, 423 (3d Cir. 2014)). As such, here, the appropriate inquiry is not, as suggested by Plaintiff, whether the Prior Complaint was dismissed with or without prejudice, or whether the dismissal is a final appealable judgment, but rather, whether the claims in the Amended Complaint are "validly in litigation" within the meaning of *Braddock*— because Delaware's substantive law governs the demand futility analysis. Indeed, contrary to Plaintiff's argument that the instant question is purely a procedural one, the determination as to which Board of Directors a plaintiff is required to allege demand futility is plainly outcome determinative in many instances, because the demand futility analysis is highly fact specific and turns on each director's personal involvement and relationship to the challenged transactions. *See Hanna v. Plumer*, 380 U.S. 460, 473 (1965) (explaining that under *Erie* and its progeny, if there is no federal rule controlling the issue, court engages in relatively unguided *Erie* choice, which requires court to ask if application of state law is likely to be determinative of outcome of lawsuit). My finding in this regard is consistent with those of other courts. While the Third Circuit has not yet had the opportunity to address the issue presented here, the Circuit Courts and federal district courts to directly confront this question have held that *Braddock* controls and the plaintiff is required to show that demand would have been futile with respect to the board as it existed at the time the amended complaint was filed – not at the time the original complaint was filed. *See In re BofI Holding, Inc. S'holder Litig.,* No. 19-55721, 2021 WL 733238, at *2 (9th Cir. Feb. 25, 2021) (applying *Braddock* and affirming district court's finding that plaintiff's claims were not "'validly in litigation' after filing [an amended complaint] because 'validly in litigation' means a proceeding that can or has survived a motion to dismiss"); *City of Cambridge Ret. Sys. v. Ersek,* 921 F.3d 912, 922 (10th Cir. 2019) (applying *Braddock* and affirming district court's dismissal for failure to plead demand futility with respect to the board of directors at the time it existed when second amended

complaint was filed); *In re First Solar Derivative Litig.*, No. 12-00769, 2016 WL 3548758, at *5 (D. Ariz. June 30, 2016) (holding that "[b]ecause Plaintiffs have failed to show that their claims were validly in litigation before March 2016, "demand futility must be tested against the current board," where plaintiff failed to demonstrate that their prior complaint, which was amended as of right, adequately pleaded demand futility); *In re Nyfix, Inc. Derivative Litig.*, 567 F. Supp. 2d 306, 311 (D. Conn. 2008) (holding that plaintiff was required to show that demand was excused with respect to the board of directors at the time the second amended complaint was filed because "the plaintiffs' First Amended Complaint failed to satisfy the requirements of Rule 23.1, the claims contained therein are not validly in litigation within the meaning of *Braddock*."). Accordingly, I find that *Braddock* is applicable, here. Because I dismissed Plaintiff's prior complaint for failure to satisfy the requirements of Rule 23.1, the claims contained therein are not validly "in litigation" within the meaning of *Braddock.*[2] Plaintiff is therefore, required to plead demand futility with respect to Synchronoss's Board of Directors in place at the time the Amended Complaint was filed: the Current Board. *Braddock*, 906 A.2d at 779 ("A claim is not validly in litigation unless it "can or has survived a motion to dismiss."). In other words, Plaintiff must allege sufficient facts to cast reasonable doubt on the independence or disinterestedness of at least five of the ten directors on the Current Board. *See Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000) ("To establish demand futility, "a stockholder must show that a 'majority' of the directors could not impartially consider a demand . . . it would be logically incoherent for Delaware courts to refuse to excuse demand

---

[2]     Moreover, the Amended Complaint adds a new theory in support of the breach of the duty disclosure claim based on Defendants' alleged failure to reveal that as part of the Activation Divestiture, Synchronoss provided a guarantee to Goldman for $30 million of debt extended to Sequential by Goldman, as well as an entirely new claim, which was raised for the first time in the Amended Complaint, based on the Board's response to Siris' offer to purchase the Company. These claims could not be "validly in litigation" prior to the filing of the Amended Complaint.

where half of the board cannot impartially consider a demand but to excuse demand where a bare majority cannot act impartially." ); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1046 n. 8 (Del. 2004) (explaining that demand is excused where if the board is evenly divided between interested and disinterested directors); *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 486 n. 3 (D.N.J. 2007) ("An evenly divided board satisfies the requirement that a majority of the board be unable to consider a demand impartially.")

## B. Demand Futility

As explained, *supra*, the Current Board consists of ten members, and in order to satisfy Rule 23.1, Plaintiff must demonstrate, with respect to each claim alleged in the Amended Complaint, that at least half of those members would not have been able to act impartially in the face of demand. *See Beam,* 845 A.2d at 1046 n. 8 The Amended Complaint alleges one count of breach of fiduciary duty against Defendants, stemming from 1) the alleged failure to act in a disinterested and independent fashion with respect to the Activation Divestiture; 2) the alleged sale of Synchronoss stock, while certain Defendants were in possession of non-public information concerning the Activation Divestiture and the need to restate the Company's financial statements; and 3) the failure to exercise care in the management and administration of the Company's affairs. *See* Am. Compl. ¶¶228-233.

In support of demand futility, Plaintiff argues that demand would have been futile with respect to seven of the ten members: Waldis, Cadogan, Hopkins, Lurie, Baker, Berger, and Aquilina.[3] Plaintiff does not argue that demand would have been futile with respect to the three remaining Board members: Rinne, Gyani, and Harris, and presumably, Plaintiff concedes that they

---

[3] Throughout this Opinion, I shall refer to Lurie, Baker, Berger and Aquilina as the "Non-Defendant Directors."

were disinterested and independent for purposes of the demand futility analysis. Plaintiff, like on the prior motion, argues that demand is excused with respect to the Director Defendants because they face a substantial risk of liability for (1) pervasive oversight failures relating to the accounting restatement; (2) the Company's misleading disclosures relating to the Activation Divestiture and the $9.2 million in revenue recognized in the fourth quarter of 2016; and (3) insider trading on the basis of material non-public information in violation of Delaware law." Pl. Br. at 18. In addition to those reasons, Plaintiff raises a new basis for finding demand futility, arguing that the Director Defendants were motivated primarily by non-corporate considerations, such as retaining their seats on the board of directors, and therefore, provided Siris with various benefits at the expense of the shareholders, in order to avoid a proxy contest, in violation of *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).[4] *Id.* at 29-34. With respect to the non-Defendant Directors, Plaintiff asserts that demand is excused as to Lurie because Synchronoss' own proxy statement "concedes he is not independent," and that as the former president and CEO of AT&T, he was interested in the Activation Divestiture. *id.* at 36-37. As to Baker, Berger, and Aquilana, Plaintiff argues that they are "interested" because of their dual role as fiduciaries of both Siris and Synchronoss, and because Siris profited from the purchase of Intralinks. *Id.* at 35-36.

Notably, Plaintiff's demand futility allegations against the Non-Defendant Directors only implicate their ability to act in a disinterested fashion with respect to the Activation Divestiture and the transactions with Siris. Plaintiff has not alleged any facts suggesting that the Non-

---

[4]      In dismissing Plaintiff's prior complaint, I permitted her to re-allege the allegations with respect to demand futility; this was not intended to be carte blanche for Plaintiff to incorporate new claims; to the extent Plaintiff wished to do so the proper procedure would have been for Plaintiff to file a motion for leave to amend before the Magistrate Judge. Nonetheless, the Court will consider Plaintiff's *Unocal* claim, and whether Plaintiff has adequately alleged demand futility with respect to that claim.

Defendant Directors would be unable to act in a disinterested or independent fashion regarding the other two bases for liability against the Director Defendants -- the insider trading claim or the *Caremark* claim emanating from the accounting restatement. Indeed, the non-Director Defendants were not on the Board at the time of those events, such that Plaintiff could allege that they face a "a substantial threat of personal liability" rendering them interested in the outcome of the litigation. *Steinberg on behalf of Hortonworks, Inc. v. Bearden*, No. 2017-0286, 2018 WL 2434558, at *6 (Del. Ch. May 30, 2018) (internal quotation marks omitted). Nor has Plaintiff specifically alleged that Baker, Berger, and Aquilina are "so beholden to an interested director," that they would be unable to impartially consider demand with respect to any and every claim involving the Director Defendants, who were board members during the time period contemporaneous with the transactions in the Amended Complaint. *Rales*, 634 A.2d at 936.

Thus, even assuming, *arguendo*, that the Director Defendants face substantial risk of liability with respect to all of the claims asserted in the Amended Complaint, that would only render demand futile as to them, and not the Non-Defendant Directors. Put differently, Plaintiff has not proffered any basis for this Court to find that demand would be futile as to the Non-Defendant Directors on the insider trading claim, or *Caremark* claims, and absent such allegations, Plaintiff is unable to establish demand futility on those claims, because even assuming that demand was futile as to the Director Defendants, Plaintiff would, nonetheless, fall two directors short of alleging that a majority of the Current Board was unable to consider a demand impartially. *See In re Ezcorp, Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) ("To determine whether the Board could properly consider a demand, a court counts heads."); *Tilden v. Cunningham*, No. 2017-0837-, 2018 WL 5307706, at *10 (Del. Ch. Oct. 26, 2018) (explaining that although the board of directors consisted of eight members, "[f]or purposes

of demand futility . . . the Court will focus on Aldrich, Atwell, Clendening, Gardner and Proctor, the five Demand Board members who indisputably joined the Board after any challenged conduct occurred.") Accordingly, this Opinion only addresses Plaintiff's demand futility arguments with respect to the four Non-Defendant Directors, regarding the claims stemming from the Activation Divestiture and the Siris transactions.

       1.  <u>Whether Demand is Excused as to the Non-Defendant Directors</u>

Under Delaware law, directors are "presumed to be independent" for purposes of evaluating demand futility. *Beam*, 845 A.2d at 1055. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816 In order to overcome the presumption of a director's independence, a plaintiff must plead "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (internal quotation omitted). A director is considered interested in the outcome of the transaction, "where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 934.; *see also Cumming v. Edens*, 2018 WL 992877, at *12 (Del. Ch. Feb. 20, 2018) ("The court will deem a director 'interested' for purposes of the [ demand futility] analysis when he stood on both sides of the transaction at issue or stood to receive a material benefit that was not to be received by others."). Furthermore, a director may also be interested in a transaction where a plaintiff alleges facts demonstrating that "a given director is dominated through a close personal or familial relationship or through force of will, or is so beholden to an interested director that his or her discretion would be sterilized." *In re Info USA, Inc*, 953 A.2d at 98; *see also Beam,* 845

A.2d at 1051-52 (a director is beholden to an interested director where their relationship is so close "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director").

       i.   <u>Lurie</u>

Plaintiff argues that demand is excused with respect to Glenn Lurie because, "[t]he Company's own proxy statement concedes that Lurie is not independent," under the Nasdaq rules.[5] Pl. Br. at 36; *see also* Am. Compl. ¶222. Moreover, Plaintiff emphasizes that at the time of the Activation Divestiture, Lurie served as President and CEO of AT&T's Mobility and Consumer Operations, and one of Synchronoss's stated goals for that transaction was to please AT&T. *Id.* Plaintiff insists that according to a Board presentation from November 30, 2016, Lurie was "highly supportive" of the transaction." *Id.* As such, Plaintiff contends that Lurie has a conflict of interest, and cannot now be expected to take action against Waldis and the other Director Defendants with respect to a transaction that he supported in his role at AT&T. *Id.*

In response, Defendants aver that under Delaware law, "a board's determination of director independence under the [exchange] Rules is qualitatively different from" a court's analysis of independence under the demand futility analysis. Def. Br. at 36-37. Additionally, Defendants reason that Lurie's support for the Activation Divestiture, prior to joining the Synchronoss Board,

---

[5]     The Amended Complaint does not identify the specific proxy statement, at issue. However, the Synchronoss December 31, 2017 Form 10-K provides, "Our Board also consults with our legal counsel to ensure that its determinations are consistent with all relevant laws and regulations regarding the definition of independence, including those set forth in pertinent listing standards of the Nasdaq Global Market . . . as amended from time to time. Consistent with those considerations, after review of all relevant transactions or relationships, our Board has affirmatively determined that all of our directors are independent directors within the meaning of the applicable Nasdaq listing standards except for Stephen G. Waldis, who serves as our Executive Chairman, and Glenn Lurie, who serves as our CEO." *See* Pl. Opp, Ex. A., at 194.

does not render him "interested" for purposes of determining demand futility. *Id.* at 38.

Defendants contend that even if Lurie's purported support for the Activation Divestiture rendered

him conflicted with respect to that transaction, it would not impact his independence with respect

to the remainder of the claims alleged in the Complaint. *Id.* at 38. I find Plaintiff's allegations

with respect to Lurie unavailing. The Delaware Chancery Court has explained that:

> The fact that directors qualify as independent under the NYSE rules
> does not mean that they are necessarily independent under our law
> in particular circumstances, the NYSE rules governing director
> independence were influenced by experience in Delaware and other
> states and were the subject of intensive study by expert parties. They
> cover many of the key factors that tend to bear on independence,
> including whether things like consulting fees rise to a level where
> they compromise a director's independence, and they are a useful
> source for this court to consider when assessing an argument that a
> director lacks independence.

*In re MFW S'holders Litig.*, 67 A.3d 496, 510 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F*

*Worldwide Corp.,* 88 A.3d 635 (Del. 2014). "[C]ourts have determined that being deemed 'not

independent' for Nasdaq purposes does not bear upon independence for demand futility

purposes.". In *Sandys v. Pincus*, 152 A.3d 124, 132 (Del. 2016), upon which Plaintiff relies, the

Delaware Supreme Court admittedly found a company's determination that two directors were not

independent under the Nasdaq rules relevant to the demand futility analysis. *Id.* at 131-133.

However, the Court explained that independence, within the demand futility analysis, "is context

specific and does not perfectly marry with the standards of the stock exchange," and then it

proceeded to analyze the specific circumstances presented in that matter. *Id.* Most relevant, while

the board in that case did not disclose precisely those two directors were interested, the Court

found that the two directors in that case were listed as non-independent because they had "a

relationship which, in the opinion of the company's board of directors, would interfere with the

exercise of independent judgment in carrying out the responsibilities of a director." *Id.* at 133

(quoting Nasdaq Marketplace Rule 5605(a)(2)). The Court further noted that both of those directors had a variety of business connections to the company's controlling shareholder, who held 61% of the company's voting shares. *Id*. at 133-34. Thus, *Sandy*s' holding rested on **both** the existence of a "mutually beneficial ongoing business relationship" between the two directors and the controlling shareholder **and** the company's designation of the board members as non-independent under the Nasdaq criteria. *Id*. Those facts are distinguishable from the present matter. *Id*. Here, the Company's determination that Lurie was interested under the Nasqaq rules may be informative to the demand futility analysis, but it is not determinative. The mere fact that Lurie is identified in a Proxy as not being independent within the meaning of the Nasdaq, is not, alone, sufficient to find that he would not be capable of acting in a disinterested fashion in the face of demand. Critically, Plaintiff has not precisely identified why the Board made the determination that Lurie was not independent, such that the Court can assess how that factor impacts the demand futility analysis, which is a context specific analysis. The Board most likely determined that Lurie was "interested" within the meaning of the Nasqaq rules because he was then-employed as the Company's CEO. *See* Nasqaq Rule 6504 ("'Independent Director' means a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director .. . ."[t]he following persons shall not be considered independent: (A) a director who is, or at any time during the past three years was, employed by the Company"). However, "[u]nder Delaware law, merely being employed by a corporation is not, by itself, sufficient to create a reasonable doubt as to the independence of a director," for demand futility purposes. *In re NutriSystem, Inc. Derivative Litig.*, 666 F. Supp. 2d 501, 515 (E.D. Pa. 2009). Accordingly, I do not find that the Company's

determination that Lurie was an "interested director," under the Nasdaq rules, sufficient to establish that he could not impartially consider demand for claims related to the Activation Divestiture.

Further, while Plaintiff has alleged that Lurie was "in favor" of the Activation Divestiture, in his capacity as AT&T's CEO nearly one year before he joined Synchronoss, that is also insufficient to establish that Lurie would have been interested respect to claims stemming from the Activation Divestiture. Indeed, under Delaware law, "mere directorial approval" of a transaction, absent other allegations demonstrating that the director benefitted from the transaction, is insufficient to establish demand futility. *Aronson*, 473 A.2d at 814. Here, Plaintiff has not alleged that Lurie, or even AT&T, who employed Lurie at the time of the Activation Divestiture, stood to receive any "material" benefit from the transaction. *Rales*, 634 A.2d at 934; *Marchand*, 212 A.3d at 818 (a director is considered interested in the outcome of the transaction, "where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."). Critically, AT&T was not the purchaser in the Activation Divestiture, or remotely affiliated with Omniglobe, such that Plaintiff could allege that Lurie would directly benefit from the transaction. Accordingly, I find that Plaintiff has not alleged facts suggesting that demand would have been futile with respect to Lurie.

### i. Baker, Berger and Aquilina

Frank Baker and Peter Berger are each a Co-Founder and Managing Partner of Siris, and they joined the Synchronoss Board of Directors following Siris' 2017 investment in the Company. Am. Compl. at ¶18. Similarly, Robert Aquilana, who joined the Board in April 2018, is an Executive Partner at Siris, and was appointed pursuant to the Investor Rights Agreement between Siris and Synchronoss. *Id*. at 223 n. 9. Based on their positions, Plaintiff argues that demand is

excused as to those individuals because they are "dual fiduciaries" and "are neither independent nor disinterested with respect to Synchronoss and Siris." Pl. Br. at 34-35. Plaintiff emphasizes that Siris benefitted from, and continues to benefit by virtue of the interest from its investment, the transactions with Synchronoss. *Id*.

In response, Defendants contend that demand is not excused as to Baker, Berger, or Aquilina, because the Amended Complaint does not include any allegations "supporting the contention that any of them lack independence from, or are allegedly beholden to, any director Defendant." Def. *Br*. at 39. Moreover, Defendant emphasizes that the mere fact that Siris and Synchronoss engaged in a transaction before Baker, Berger, and Aquilina joined the Synchronoss Board is not sufficient to establish demand futility on the claims stemming from the Siris transactions. *Id*. at 49-40.

In order to show that demand is futile with respect to Baker, Berger and Aquilina, plaintiff must allege particularized facts which raise a reasonable doubt that they would be incapable of acting on demand without falling subject to extraneous considerations or influences. *Aronson*, 473 A.2d at 816. Here, Plaintiff alleges two disabling considerations with respect to these directors: (1) their status as dual fiduciaries of both Synchronoss and Siris, and (2) that they were nominated to the Board by Siris, which benefitted substantially from the transactions with Synchronoss, *i.e.*, 1) by securing the investor rights agreement which allowed Siris to appoint these individuals to the Board; 2) purchasing Intralinks, which Siris later resold for a profit; and 3) the ongoing interest from Siris investment in Synchronoss. I find these bases insufficient to establish that Baker, Berger and Aquilina could not have impartially considered demand.

Directors who sit on the board of directors of two corporations, are "dual fiduciaries" of the entities, who owe both entities fiduciary duties. *See Weinberger v. UOP, Inc.* 457 A.2d 701,

703 (Del. 1983). As such, one "[c]lassic example[] of director self-interest in a business transaction involve[s] either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." C*ede & Co. v. Technicolor, Inc*., 634 A.2d 345, 362 (Del. 1993). With respect to such transactions "[i]f the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest." *Weinberger,* 457 A.2d at 703. However, "[i]f the interests of the beneficiaries are aligned, then there is no conflict." *Id.* Moreover, a director may also be found to lack independence, "when a director is employed by or receives compensation from other entities, and where the interested party who would be adversely affected by purs[u]ing litigation controls or has substantial influence over those entities, a reasonable doubt exists about that director's ability to impartially consider a litigation demand." *In re EZCORP Inc. Consulting Agreement Derivative Litig.,* 2016 WL 301245, at *34 (quoting *Beam*, 845 A.2d at 1049).

As members of the Current Board, and individuals who are also affiliated with Siris, Baker, Berger, and Aquilina are "dual fiduciaries" rendering them interested in any subsequent transactions between Siris and Synchronoss. *See e.g. Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors ... were interested in the MEC transaction because they served on the boards ... of both MOXY and FSC."); *Goldman v. Pogo.com Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, [were] both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the ... [l]oan."). However, Baker, Berger, and Aquilina were not members of the Synchronoss's board of directors at the time Synchronoss negotiated and finalized the two transactions with Siris, and did not constitute "dual fiduciaries," at the time that transaction was

executed. Thus, the instant matter is distinct from the typical dual fiduciary matter, where the plaintiff challenges a self-interested transaction. In other words, contrary to Plaintiff's assertions Baker, Berger, and Aquilina did not stand "on both sides" of the transactions between Synchronoss and Siris because they were not yet directors of Synchronoss when the two companies executed the deals. *C.f. Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent because officers were dual fiduciaries at the time of the transaction). An argument could be made, however, that these individuals, by virtue of their current affiliation with Siris, would be unlikely to fairly consider demand on any claims that involve Siris. However, Plaintiff has not alleged particularized facts supporting that theory. Importantly, Siris is not a defendant in the instant lawsuit, such that it could be said that Siris is an "interested party who would be adversely affected by" the current litigation. *EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *36; *c.f. Sciabacucchi v. Liberty Broadband Corp.*, No. 11418-, 2018 WL 3599997, at *12 (Del. Ch. July 26, 2018) (finding that a director was beholden to defendant, and therefore, could not impartially consider demand for claims against defendant, who was both the chairman of the board and 25% stockholder of the company that employed that director ). More to the point, Siris, Baker, Berger and Aquilina are not named as defendants in this action, nor has Plaintiff alleged that there is any possibility that this action could result in the unwinding of Siris' transaction with Synchronoss, such that Siris faces any potential risk of harm from this lawsuit. Rather, Plaintiff seeks to hold Defendants, members of the Prior Board who approved the transactions with Siris, personally liable. Because Baker, Berger, Aquilina were not board members then, they face no threat of liability. Accordingly, I do not find that Baker, Berger, and Aquilina's status as the co-founders or officers of Siris, respectively, creates reasonable doubt that

they could act impartially to consider demand against the Director Defendants with respect to the Siris transactions.

Further, the fact that Baker, Berger and Aquilina obtained their seats on the Board as a result of Siris transactions, wherein Siris obtained, *inter alia*, the right to approve four members of the Synchronoss Board of Directors, is also insufficient to render them incapable of acting disinterested in the face of demand. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 68 (Del. Ch. 2015) (finding that the fact that an alleged controlling stockholder, "played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence, with respect to transaction between corporation and controlling shareholder"); *Fin. Hldgs. LLC S'holder Litig.,* 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."). A "director's nomination or election at the behest of a controlling shareholder is not enough to show a lack of independence because that "is the usual way a person becomes a corporate director." *Kanter*, 489 F.3d at 179 (quoting *Aronson*, 473 A.2d at 816.) Rather, to determine independence, it is the "care, attention and sense of individual responsibility to the performance of one's duties, not the method of election" that matters. *Id*. In *Baira*, the plaintiffs alleged that demand was futile with respect to claims arising from certain transactions entered into between Orbitz Woldwide, Inc, and its parent company and controlling shareholder, Travelport Limited ("Travelport"). 119 A.3d at 47-49. The plaintiff argued that one of Orbitz's directors, Kenneth Esterow, could not impartially consider demand because he had previously served as an executive at Travelport for 16 years, and was appointed to the Orbitz Board as a "loyalty appointment" three months after leaving Travelport. *Id*. at 59. The court found the inference that Esterow "was nominated by or

elected at the behest of Travelport, which had the ability to control[ ] the outcome of a corporate election by virtue of its majority interest when Esterow joined the Orbitz board, does not overcome his presumed independence" *Id*. at 60 (internal quotation marks omitted). Similarly, here, I do not find that Berger, Baker, and Aquilina's presumption of independence is overcome by virtual of the fact that they were Siris's nominees to the Board of Directors.

Having found that demand is not excused with respect to the four non-Defendant Directors on the claims involving the Activation Divestiture and the Siris transactions with Siris, I need not addresses the parties' arguments with respect to the Director Defendants on these claims. As explained, *supra*, in order to survive a motion to dismiss based on failure to allege demand futility, Plaintiff "stockholder must show that a 'majority' of the directors could not impartially consider a demand." *Beneville*, 769 A.2d at 82. Because the Current Board consists of ten members, Plaintiff is required to allege sufficient facts demonstrating that demand would have been excused as to at least five members, and even if I concluded that demand was excused with respect to Waldis, Cadogan, and Hopkins, Plaintiff would be two member short of a "majority" of the Board. Accordingly, the Amended Complaint is be dismissed for failure to plead demand futility pursuant to Federal Rule of Procedure 23.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED**. Plaintiff has not alleged facts demonstrating that a majority of the Board of Directors, as it existed at the time the Amended Complaint was filed, would not have acted in a disinterested and independent fashion in the face of demand. Accordingly, Plaintiff has not shown that demand was excused, and the Complaint is dismissed.

Dated:  April 30, 2021                                   /s/ Freda L. Wolfson
                                                                  Hon. Freda L. Wolfson
                                                                  U.S. Chief District Judge